# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff.

  vs.                                          No. CR 10-1727 JB

VINCENT J. GARCIA,

        Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the United States' Objections to Presentence Report, filed May 4, 2012 (Doc. 89)("U.S. Objections"); and (ii) the Defendant Vincent Garcia's Formal Objections to the Presentence Report, filed August 6, 2012 (Doc. 101)("V. Garcia Objections"). The Court held an evidentiary hearing on August 15, 2012. The primary issues are: (i) whether the Court should accept that the parties' stipulation that the gross loss Defendant Vincent Garcia's offense of bank fraud caused is $842,237.44; (ii) how any credits that V. Garcia has should be applied against the gross loss that his offense caused; (iii) whether V. Garcia should receive an enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C) for the use of "sophisticated means" in the commission of bank fraud; and (iv) whether V. Garcia should receive an enhancement pursuant to U.S.S.G. § 2B1.1(b)(2) based upon the number of victims of his offense. The Court will adopt the parties' proposed method for calculating the gross loss, but the Court will not adopt the parties' stipulated gross loss amount, because the evidence before the Court does not support their figure. The Court will apply V. Garcia's credits to offset the gross loss amount on a victim by victim basis. V. Garcia's credits are the collateral

he pledged to obtain loans with financial institutions that are victims in this case, and the Plaintiff United States of America has made no allegation that those loans were fraudulently obtained. Because V. Garcia's offense of bank fraud arises from the fraudulent draw downs he submitted on otherwise legitimate loans, and the sum of those fraudulent draw downs is the gross loss amount his offense incurred, the Court will not apply the total value of V. Garcia's credits -- which were pledged for legitimate loans -- to offset the gross loss amount incurred in fraudulent draw downs. Rather, the Court finds that a reasonable estimate of the net loss V. Garcia's bank fraud caused may be ascertained by reducing V. Garcia's credits by the ratio of his fraudulent draw downs to the outstanding balance on his loans, and then applying that reduced credit amount to offset V. Garcia's gross loss amount. The Court determines that V. Garcia did not use sophisticated means to commit bank fraud, and sustains V. Garcia's objection to a 2-level increase to his offense level pursuant to U.S.S.G § 2B1.1(b)(10)(C). Lastly, the Court determines that the total number of victims in this case is less than ten, and will accordingly not enhance V. Garcia's offense level pursuant to U.S.S.G. § 2B1.1(b)(2). The Court thus sustains the United States and V. Garcia's objections in part and overrules them in part.

## FACTUAL BACKGROUND

This case involves V. Garcia's, David Garcia's, and Derek Barnhill's misappropriation of loan funds to pay for personal living expenses, personal property, and the purchase of a casino in the state of Washington. See Presentence Investigation Report ¶ 13, at 4, disclosed Feb. 3, 2012. The parties dispute the gross loss amount that V. Garcia's offense caused. Rule 32(i)(3)(B) requires that a district court at sentencing "must -- for any disputed portion of the presentence report or other controverted matter -- rule on the dispute or determine that a ruling is

unnecessary . . . ."  Fed. R. Crim. P. 32(i)(3)(B).  See United States v. Orr, 567 F.3d 610, 614 (10th Cir. 2009)(same).  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 32(i)(3)(B) purposes.

When the parties dispute the gross loss amount that a defendant's offense caused, for the purposes of sentencing the defendant under U.S.S.G. § 2B1.1, the government bears the burden of proving its estimation of gross loss by a preponderance of the evidence.  See United States v. Kieffer, 681 F.3d 1143, 1168 (10th Cir. 2012)("[T[he Government met its initial burden of proving relevant conduct, it then had to prove the amount of loss (or reasonable estimate thereof).  The Court has made a "reasonable estimate" of the value of disputed assets and collateral, based upon the information available to the Court.  See U.S.S.G. § 2B1.1, cmt. n.3(C)("The court need only make reasonable estimate of the loss.").

1.      In 2005, V. Garcia and D. Garcia, V. Garcia's son, created Blue Dot Corporation, "a land development company in Albuquerque, New Mexico."  PSR ¶ 13, at 14; id. ¶ 24, at 9.

2.      Blue Dot was the general contractor for the development of the properties known as the Downtown Anasazi, LLC and Copper Square, LLC located in Albuquerque, and Lockhaven Estates, LLC located in Clovis, New Mexico.  See PSR ¶ 13, at 4; V. Garcia Objections at 11.[1]

---

[1] The United States Probation Office ("USPO") states in the PSR that Blue Dot was an "umbrella corporation for Downtown Anasazi, Copper Square, and any other LLC's Garcia may have owned."  PSR ¶ 13, at 4.  V. Garcia disputes this statement and asserts that Blue Dot was the general contractor for those projects.  See V. Garcia Objections at 11 ("Blue Dot did not own nor was it an umbrella corporation for Anasazi Downtown LLC, Copper Square or any other LLC's, although if it had been, there is no preclusion for doing so.").  The United States seems to agree that Blue Dot was not an umbrella company that owned the LLCs, but rather was separate from the LLCs.  See Indictment at 3-4, filed June 10, 2010 (Doc. 2), U.S. Objections at 3 (listing the fraudulent draw downs as requested on behalf of the respective LLCs, and not referring to

3.       D. Garcia was Blue Dot's vice president and employed as its General Contractor. See Plea Agreement ¶ 8(g), at 5, filed August 19, 2011 (Doc. 76); PSR ¶ 15, at 5; id. ¶ 24, at 9.

4.       In exchange for his services as the general contractor, D. Garcia received from Blue Dot a salary and construction work on his personal residence.  See PSR ¶ 24, at 9; id. ¶ 26, at 9.

5.       Around 2005, V. Garcia took an ownership share in Lockhaven Estates.  See PSR ¶ 31, at 13.

6.       V. Garcia took ownership of Lockhaven Estates with Derek Barnhill, an associate who had done construction management and real estate development with V. Garcia in the past. See PSR ¶ 31, at 13.

7.       V. Garcia took out a loan for $1,800,000.00 from Columbian Bank & Trust ("Columbian Bank") in 2006 to fund the development of Lockhaven Estates (the "Lockhaven Estates loan").  See Transcript of Hearing (taken Aug. 25, 2012) at 61:3-9 (Meacham)("The Columbian, . . . created a million eight credit in 2006 and secured by lock[]haven")("Tr.");[2] id. at 76:19 (Meacham)("The loan was a million eight.").[3]

---

Blue Dot as the owner of the LLCs).  The Court has no evidence before it to contradict V. Garcia and the United States' position regarding the relationship of Blue Dot to the LLCs.  The Court thus concludes that Blue Dot was the general contractor for the development of the Downtown Anasazi, Copper Square, and Lockhaven Estates, and not an umbrella company that owned the LLCs.

[2] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

[3] The USPO states in the PSR that V. Garcia took out a $2,100,000.00 loan to fund the development of Lockhaven Estates.  See PSR ¶ 31, at 13.  V. Garcia objects to this figure and asserts that correct amount of the loan is $1,800,000.00.  See V. Garcia Objections at 20.  At the hearing, the United States presented evidence that V. Garcia took out a loan for $1,800,000.00 to

- 4 -

8.    The Lockhaven Estates loan's terms provided that V. Garcia and Barnhill could access the funds by submitting draw-down[4] requests to Columbian Bank.  See PSR ¶ 31, at 13.

9.    In 2006, V. Garcia and D. Garcia obtained an $11,000,000.00 construction loan from Columbian Bank to finance the Downtown Anasazi project (the "Downtown Anasazi loan"), a "condominium development in downtown Albuquerque."  PSR ¶ 13, at 4.

10.    The Downtown Anasazi is a "development project," a property that is bought by an investor to be developed so as to generate income.  Tr. at 90:18-92:16 (Bowles, Ilfeld).

11.    V. Garcia guaranteed his loans with Columbian Bank with his personal property and assets.  See PSR ¶ 60, at 23 ("According to the 'Unconditional Guaranty' between . . . Columbian . . . and Vincent Garcia dated Aug. 4, 2006, . . . Garcia pledged a lien upon and a right of setoff against all monies, securities, and other property of Guarantor or hereafter in the possession of or on deposit with the Lender . . . ."); see Tr. at 108:22-109:11 (Bowles, Garcia)(Q: "[D]id you pledge collateral as against the loan [] on the Anasazi project?" A: "I did. . . .  that says that the [guarantor] specifically []grants[] a security . . . ."  Q: "[W]ho was the person receiving this guarantee?"  A: "The security interest in the guarantee was received by the lender Columbian bank and trust.").

_____

fund the Lockhaven Estates project in 2006.  See Tr. at 61:3-9; id. at 76:19 (Meacham).  The Court finds this testimony is reliable and that V. Garcia took out a loan for $1,800,000.00, not $2,100,000.00 to fund the Lockhaven Estate project in 2006.

[4] A "drawdown" occurs when a "customer . . . establishes a maximum loan balance that the bank will permit" the customer to maintain.  The customer "can draw down on the line of credit at any time, as long as he or she does not exceed the maximum set in the agreement."  Line of   Credit   --   LOC,   Investopedia.com,   http://www.investopedia.com/terms/1/lineofcredit.asp#axzz2M7t56Nz5 (last visited Feb. 27, 2013).

12.     Over the years of 2006 and 2007, V. Garcia directed Barnhill to submit draw-down requests on the loans with Columbian Bank, and he knew that at least some of the funds obtained "would not be utilized directly in the construction" of the project on behalf of which the draw down was submitted.  Plea Agreement ¶ 8(b), at 4; PSR ¶¶ 32-36, at 13-15 (explaining that, according to Barnhill, V. Garcia expressed that in 2006 he was in need of money to proceed with the Downtown Anasazi LLC, and directed Barnhill to submit draw-down requests on behalf of Lockhaven Estates for funds that would be used for the Downtown Anasazi and Blue Dot's expenses); V. Garcia Objections at 20 ("Mr. Garcia never instructed Mr. Barnhill to make fake invoices, but rather to get draws on the loan.").

13.     V. Garcia suggested to Barnhill, "in substance," that Barnhill "should generate some false invoices for work on Lockhaven for submission to Columbian Bank and Trust, and that [V. Garcia] would use the proceeds for Blue Dot salaries and for expenses incurred on the Anasazi project."  Government Exhibit 4 at 5.[5]  See PSR ¶¶ 31-32, at 13[6] (stating that V. Garcia

_____

[5]  Government Exhibit 4 is Barnhill's Plea Agreement, filed Dec. 16, 2010 (Doc. 47).  See Tr. at 10:1-13, id. at 10:20-11:1 (Gerson)("[I] ask the Court also to consider the [D]er[ek] [B]arn[]hill [P]lea [A]greement and the recitation of facts in support . . . where he explains the criminal conduct that he was agreeing to commit with Mr. Garcia . . . ."); id. at 11:2-4 (Bowles)("[F]or[] purposes of what we're doing right now we can make that an exhibit.  I have no objection to that if the [C]ourt wants me to."); id. at 11:7-9 (Gerson)("[W]e could call it [E]xhibit 4 . . . .").

[6]  V. Garcia objects, in part, to these statements in the PSR.  See V. Garcia Objections at 20-21.  V. Garcia asserts: "Mr. Garcia did not sign any of the draw requests where Barnhill acknowledges creating false invoices, but Mr. Garcia did sign most, if not all of the others for the project.  Mr. Garcia never instructed Mr. Barnhill to make fake invoices, but rather to get draws on the loan."  V. Garcia Objections at 20.  The USPO states in the PSR that, when a Federal Bureau of Investigation agent interviewed him, V. Garcia stated that he "did not prepare the draws or handle the invoices to be submitted for the draws."  PSR ¶ 21, at 7.  V. Garcia did not, however, submit evidence at the hearing to contradict Barnhill's statement that V. Garcia directed him "in substance" to submit fraudulent draw downs, and that V. Garcia "told [Barnhill]

- 6 -

"suggested Barnhill should generate some false invoices for work on Lockhaven to be submitted to Columbian . . . , and he would use the proceeds for Blue Dot Corporation salaries and for expense incurred on the Anasazi Project," and that "no Lockhaven money went out of the office without Vincent Garcia's knowledge").

14.     Barnhill submitted a series of draw downs to Columbian Bank on behalf of Lockhaven Estates, the Downtown Anasazi, and Copper Square, which fraudulent invoices supported.  See PSR ¶¶ 33-36, at 13-15; U.S. Objections at 3.

15.     Barnhill created invoices using the names of businesses with whom V. Garcia and Barnhill had previously worked and by copying company logos from internet websites, which he placed on the invoices.  See PSR ¶ 33, at 13-14.

16.     V. Garcia intended to payback the funds that Barnhill obtained through the draw downs that did not go to the construction projects after the Downtown Anasazi became profitable.  See Government Exhibit 4, at 5; PSR ¶ 32, at 13.

---

to generate false invoices in the name of a business [they] had previously created."  Government Exhibit 4, at 5.  V. Garcia further admits that he instructed Barnhill to submit a draw-down request for funds that V. Garcia knew would not be used for the purposes represented to Columbian Bank, see Plea Agreement ¶ 8(b), at 4, and that he directed Barnhill to "get draws on the loan," V. Garcia Objections at 20.  Although V. Garcia asserts that Barnhill accessed some funds from Columbian Bank without V. Garcia's knowledge, see V. Garcia Objections at 20, he does not dispute that the draw downs set forth in Counts 1-7 of the Indictment at 3-4, filed June 10, 2010 (Doc. 2), were not used for the purposes represented to Columbian Bank and First Financial Credit Union.   Although Barnhill's statement that V. Garcia directed him "in substance" to create fraudulent invoices is ambiguous, Barnhill's later statement that V. Garcia directed him to "generate false invoices in the name of a business we had previously created" is not.  Government Exhibit 4, at 5.  The Court concludes, thus, that in the absence of evidence to contradict Barnhill's statements in Government Exhibit 4, V. Garcia directed Barnhill to create fraudulent invoices to support draw-down requests that would not be used on the projects represented to Columbian Bank.

17.     In 2007, V. Garcia increased his loan with Columbian Bank from $11,000,000.00 to $16,000,000.00.  See PSR ¶¶ 19-21, at 7; Plea Agreement ¶ 8(b), at 4.[7]

18.     V. Garcia's increased loan with Columbian Bank allowed the Downtown Anasazi and Copper Square projects to be funded with one loan, but did not leave enough money to complete or improve either project.  See PSR ¶ 21, at 7.

19.     Columbian Bank informed V. Garcia that it would not lend him any more funds until he increased his liquidity.  See PSR ¶ 19, at 7 ("In order to secure a larger loan, CBT advised Vincent he needed additional liquid assets . . . ."); Plea Agreement ¶ 8(b), at 4 ("Based on a recommendation by the bank's correspondent broker and his statement that the bank was concerned about our liquidity," V. Garcia purchased the J&J Casino).

20.     Columbian Bank also informed V. Garcia that it would not loan him any more funds until he moved Copper Square to another lender.  See PSR ¶ 21, at 7 ("CBT advised

---

[7] Neither the USPO nor the parties provided the Court with the exact date that V. Garcia's loan with Columbian Bank was increased to $16,000,000.00.  V. Garcia informs the Court that he authorized a draw-down of $365,677.00 on February 2, 2007, that he used those proceeds to purchase a casino in Washington in the hopes of increasing his liquidity, and that he purchased the casino because Columbian Bank was concerned about his liquidity.  See Plea Agreement ¶ 8(b), at 4.  See also PSR ¶ 19, at 7 ("In order to secure a larger loan, CBT advised Vincent he needed additional liquid assets; therefore, . . . .  Vincent later purchased . . . the casino . . . .").  The USPO indicates that, after Columbian Bank increased V. Garcia's loan to $16,000,000.00, Columbian Bank would not lend him any more funds until the Copper Square project was moved to a different lender.  See PSR ¶ 21, at 7.  V. Garcia applied to First Financial Credit Union for a loan to fund the Copper Square project in late 2007.  See Tr. at 36:10-11 (Heyward)("The application process started somewhere around November of 2007 and the loan was funded in February 2008.").  Based upon these facts, the Court concludes that Columbian Bank increased V. Garcia's loan to $16,000,000.00 and then informed V. Garcia that he could receive no further funds until he increased his liquidity and/or moved the Copper Square project to a different lender, and, thus, the increase in V. Garcia's loan with Columbian Bank occurred before V. Garcia purchased the casino in February, 2007, in an attempt to increase his liquidity and before First Financial funded a loan for the Copper Square project in February, 2008, and before he purchased the J&J Casino.

Vincent Garcia they would not loan any further money until the loan securing the Copper Square building was moved to another lender.").

21.     On February 13, 2007, V. Garcia directed Barnhill to submit a draw-down request to Columbian Bank in the amount of $365,677.00.  See Plea Agreement ¶ 8(b), at 4.

22.     V. Garcia was aware that Barnhill represented to Columbian Bank that the funds would be used for legitimate construction expenses, but V. Garcia planned to use the funds to purchase a casino.  See Plea Agreement ¶ 8(b), at 4.

23.     V. Garcia used the funds from the February 13, 2007, draw down to purchase the J&J Casino in Spokane, Washington.  See Plea Agreement ¶ 8(b), at 4 (V. Garcia admitting that he used the funds from the February 13, 2007, draw down to purchase a casino in Spokane); PSR ¶ 19, at 7 (stating that V. Garcia purchased the J&J Casino in Spokane).

24.     V. Garcia hoped that the proceeds he received from J&J Casino would increase his liquidity and help him fund his development projects.  See Plea Agreement ¶¶ 8(b)-(c), at 4 (V. Garcia stating that he instructed Barnhill to draw down $365,677.00 from the Downtown Anasazi loan, which V. Garcia used to purchase the casino "with the intent to provide additional cash for the completion of the [Downtown Anasazi] building if the casino proved successful.").

25.     V. Garcia obtained a $7,000,000.00 construction loan from First Financial in February, 2008 for the Copper Square project (the "Copper Square loan").  See Tr. at 36:3-18 (Gerson, Heyward).

26.     Upon closing of the Copper Square loan, approximately $4,000,000.00 was transferred to Columbian Bank, Columbian Bank did not take an additional $1,000,000.00 from

the loan in exchange for receiving a fourteen-point-nine percent participation interest[8] in Copper Square, and Columbian Bank agreed to subordinate its lien on Copper Square to First Financial's.  See Tr. at 37:5-8 (Gerson, Heyward)(Q: "And the amounts that your bank first pushed out the door were to pay some obligation that Mr. Garcia ow[es] -- owed to Columbian . . . is that correct?" A: "Yes."); id. at 41:2-7 (Gerson, Heyward)(explaining that, when Copper Square is sold, the owner of Columbian Bank's participation interest will receive a share "based on what Columbian bank and trust's original participation was at the point" First Financial funded the Copper Square loan, which is fourteen-point-nine percent of the net proceeds); id. at 51:5-6 (Heyward)("[T]hree or four million dollars went to Columbian bank."); PSR ¶ 16, at 6 (explaining that upon closing of the Copper Square loan, "$4 million was paid to CBT"); Tr. at 36:23-25 (Heyward)("They withheld $1 million participation interest . . . ."); id. at 51:7-15 (Heyward)("They agreed to hold back or not accept a million dollars, they agreed to subordinate their first position their first l[ie]n to our lien and take a second l[ie]n for a million dollars.  That . . . million that's what was called the participation interest.").

27.     First Financial did not receive any value from the creation of a participation interest in Copper Square.  See Tr. at 51:16-17 (Bowles, Heyward)(Q: "Did your bank receive any value from that transaction?" A: "No.").

28.     As with his loans with Columbian Bank, V. Garcia personally guaranteed the Copper Square loan.  See Tr. at 166:15-24 (Court, Bowles, Gerson)(Bowles: "[T]he personal

---

[8] A "loan participation note" is a "fixed income security that permits investors to buy portions of an outstanding loan or package of loans. . . .  [H]olders participate, on a pro rata basis, in collecting interest and principal payments."  Loan Participation Note -- LPN, Investopedia.com, http://www.investopedia.com/terms/l/lineofcredit.asp#axzz2M7t56Nz5 (last visited Mar. 5, 2013).

guarantees I for[]g[o]t to mention to the Court [are] as against both banks."   Court: "Let me make sure I understand what you're saying.   He gave personal guarantees on the say coin collection to both banks.   Is that what you're saying?"   Bowles: "All collateral as to both banks." . . . Gerson: "I'll accept Mr. Bowles' representation.")[9]

29.     The Copper Square project was designed to generate cash through the sale of units in the building, the proceeds from which would be used to fund further development and pay down the principal on the Copper Square loan.   See Tr. at 37:15-23 (Heyward)("[T]he plan was . . . to build additional units which would sell and the sale would generate lump sum reductions of principal on the loan, generate more cash flow for Mr. Garcia . . . .").

30.     Shortly after the Copper Square loan was fully funded, a condominium was sold in the property for $500,000.00.   See Tr. at 50:14-20 (Bowles, Heyward).

31.     The proceeds from the condominium sale went to First Financial to reduce the Copper Square loan.[10]   See Tr. at 112:14-113:4 (Garcia).

---

[9] The United States first asserted that First Financial has no security interest in V. Garcia's personal property or assets, and thus the Court should not apply the value of those items as a credit against First Financial's losses.   See Tr. at 138:21-139:1 (Gerson, Court)(the United States asserts that First Financial has no security interest in V. Garcia's personal property or assets).   Later at the hearing, however, V. Garcia asserted that he personally guaranteed his loans with both Columbian Bank and First Financial, and that he pledged the same personal property and assets as collateral to both institutions.   See Tr. at 166:15-18 (Court, Bowles)(Court: "Let me make sure I understand what you're saying.   He gave personal guarantees . . . to both banks." Bowles: "All the collateral as to both banks.").   The United States accepted this assertion.   See Tr. at 166:19-24 (Court, Gerson)(Court: "Do you have any dispute on that?" Gerson: "No I'll accept Mr. Bowles' representation.").

[10] Heyward asserts that First Financial did not receive the full proceeds from the sale of a condominium in Copper Square.   Compare Tr. at 50:14-20 (Gerson, Heyward)(Q: "Do you recall, . . . at one time during the course of this loan receiving a payment in the amount of $500,000 from the sale of a condo at Copper Square?"   A: "We did not receive the entire proceeds, but, yes, a condo sold a few days after it was funded in February of 2008."), with id. at

32.     Between 2006 and 2008, the following line items were based upon fraudulent invoices in draw downs submitted to Columbian Bank and First Financial:

a.     Draw down submitted to Columbian Bank on December 20, 2006: $42,323.00 based upon fraudulent Qwest invoice;

b.     Draw down submitted to Columbian Bank on January 23, 2007: $38,419.00 based upon fraudulent Cox Communications invoice;

c.     Draw down submitted to Columbian Bank on February 13, 2007: $365,677.00 based upon fraudulent sheet rock invoice from DevCorp;

d.     Draw down submitted to Columbian Bank on July 30, 2007: $62,156.52 based upon invoices for construction performed at D. Garcia's personal residence;

e.     Draw down submitted to Columbian Bank on August 15, 2007: $144,478.80 based upon fraudulent R&D Perfection Cleaning invoice;

f.     Draw down submitted to Columbian Bank on October 8, 2007: $61,182.12 based upon invoices for construction performed at D. Garcia's personal residence;

g.     Draw down submitted to First Financial on May 15, 2008: $128,471.25 based upon fraudulent Jay Lial A/C invoice;

---

112:14-113:4 (Garcia, Bowles)(A: "At that same time we had secured one solid buyer. . . . [T]his one did close before the market crashed and he bought a . . . unit . . . on the ground floor . . . I believe . . . all of the funds in total went to first financial credit union to reduce the loan amount." Q: "And do you know the exact figure?" . . . A: "It's in excess of $500,00."). Although the parties dispute the exact amount that was transferred to First Financial upon the condominium's sale, the Court concludes that the proceeds were used to pay down the outstanding balance on V. Garcia's Copper Square loan, as no party disputes this fact.

<u>See</u> U.S. Objections at 3-4.[11]

33.     The total amount of fraudulent line items submitted in draw downs to Columbian Bank and First Financial, which the lending institutions funded, is $842,708.79.  <u>Cf.</u> Plea Agreement ¶ 10(b), at 6 (listing the stipulated gross loss amount as $842,237.44); U.S. Objections at 4 (listing the total loss amount from fraudulent line items as $842,237.44); V. Garcia Objections at 2 (listing the total loss from fraudulent line items as $842,237.44).[12]

34.     The commercial real estate market has been in a nationwide decline since 2008, and the collapse of the mortgage and subprime real estate market has had a negative, state-wide impact on New Mexico's real estate values.  <u>See</u> Tr. at 91:21-92:9 (Bowles, Ilfeld)(A: "[T]here was significantly decreased demand for commercial property, lease space, and ownership because companies . . . revenues['] were declining, and so it was kind of a domino effect resulting in a severely depressed commercial real estate market in the period probably starting from . . . early 2008's . . . .  It's . . . nationwide . . . it's certainly statewide"); Defense Exhibit A[13] at 2 ("New Mexico suffered the same precipitous real estate declines as other areas nationally . . .

_____

[11] These fraudulent draw-down items are derived from a chart that the United States provided with its U.S. Objections.  <u>See</u> U.S. Objections at 3-4.  At the hearing, V. Garcia informed the Court that he agrees with the fraudulent items listed in the chart.  <u>See</u> Tr. at 159:23-160:3 (Court, Bowles)(Court: "[O]n page 3 and 4, . . . you agree with this chart, right, the one on 3 and 4?"  Bowles: "Oh yes I do I do agree with that.").  The Court thus accepts that these line items were submitted to the lending institutions based upon fraudulent invoices.

[12] The Court will not accept that the stipulated gross loss amount is equal to the sum of all of the fraudulent line items, because the sum of the fraudulent line items is not $842,237.44.

[13] Defense Exhibit A is a Letter from Larry Ilfeld re: Anasazi Building development at 2, dated Mar. 14, 2012.  <u>See</u> Tr. at 88:22-89:5 (Bowles, Ilfeld, Court Gerson)(Q: "Did you prepare a report, sir, . . . ?" A: "Yes, I did.  I wrote a letter, yes."  Q: "And that is market as Exhibit A to our formal objections, Your Honor, and I would tender that also." . . . .  The Court: "Any objection to receiving that into evidence?" Gerson: "No.").

.  [C]ountless real estate projects that were well conceived, accurately proforma'd and financed  .

. . still failed because of the prevailing economic conditions that overshadowed all other factors

combined: demand disappeared.").

35.    As part of the downturn in the commercial real estate market, "demand for new

space, and particularly in central business district nationally, came to a screeching halt."

Defense Exhibit A at 2.

36.    In Albuquerque, when the commercial real estate market deflated, "several major

commercial occupants vacated Downtown for alternative locations, the City's Downtown

desirability as a place to locate businesses, and consequently to develop new real estate projects,

flagged."  Defense Exhibit A at 2-3.

37.    V. Garcia eventually defaulted on his Downtown Anasazi and Lockhaven Estates

loans.  See PSR ¶ 60, at 22 ("Mr. Garcia[] . . . ultimately defaulted on both loans.").

38.    Columbian Bank closed in August, 2008, and the Federal Deposit Insurance

Corporation ("FDIC") was named Columbian Bank's receiver.   See Tr. at 57:1-4 (Gerson,

Meacham).

39.    Columbian Bank failed because of it made bad loans and had poor management.

See Tr. at 95:11-18 (Ilfeld)(explaining that, according to the FDIC, "at least a partial cause of"

Columbian Bank's failure was its "ba[d] loans that were made, and . . . mismanagement, . . . in

that [order.]")(citing Office of Inspector Gen., Fed. Deposit Ins. Corp., Report No. AUD-09-005,

Material Loss Review of the Columbian Bank and Trust Company, Topeka, Kansas (Mar. 2009)

at 2, filed August 6, 2012 (Doc. 103-3)).

- 14 -

40.     After the FDIC became Columbian Bank's receiver, it sold Columbian Bank's participation interest in Copper Square to an investment group based in Dallas, Texas.  See Tr. at 40:20-41:1 (Heyward)("[W]hen Columbian bank was taken over by FDIC that asset became property of FDIC. . . .   [T]hat participation interest . . . they . . . sold . . . to this investment group out of Dallas who now owns that note or that participation interest."); id. at 51:18-22 (Bowles, Heyward).

41.     The details of the sale of Columbian Bank's participation interest to a Dallas-based investment group are unknown.  See Tr. at 51:23-52:8 (Bowles, Heyward)(Q: "[D]id FDIC receive any value that you're aware of from the sale of that note that participatory interest to this group in Dallas?" A: "I have no idea really.").

42.     The current outstanding amount that V. Garcia owes to the FDIC for his Lockhaven Estates and Downtown Anasazi loans is $15,430,533.08.  This figure includes the $555,000.00 which the FDIC received from the sale of the Downtown Anasazi mortgage note. See PSR ¶ 48, at 19.[14]

---

[14]  At the hearing, V. Garcia asserted that he should receive a $4,200,000.00 credit for the funds which were transferred to Columbian Bank on the closing of the Copper Square loan, pursuant to U.S.S.G. § 2B1.1, cmt. n.3(E)(i).  See Tr. at 103:4-12 (Bowles).  The United States asserted that it understands that Columbian Bank received $4,300,000.00 on the closing of the Copper Square loan, but that those funds are not "anything in the nature of collateral or credit to be applied against something.  That was actually reduction in loan principal with respect to Columbian bank and trust and that's [] already reflected in the numbers that the Court heard today . . . ."  Tr. at 131:6-17 (Gerson).  The Court concludes that V. Garcia should not receive a credit for the funds that were transferred to Columbian Bank upon the closing of the Copper Square loan, because, rather, the USPO included those funds when calculating the outstanding balance on V. Garcia's loans with Columbian Bank.  First of all, United States Probation Officer David Wayne Mills informed the Court that the USPO reduced the outstanding balance of V. Garcia's Downtown Anasazi loan by the $555,000.00 which the FDIC received from the sale of the Downtown Anasazi's mortgage note, see Tr. at 132:25-133:4 (Probation Officer), which indicates that the USPO's method of calculation in this case was to reduce the loans' outstanding

- 15 -

43.     The Lockhaven Estates loan has an outstanding balance of $2,998,866.00, which includes approximately $1,100,000.00 interest and fees: $672,000.00 in interest, $403,000.00 in default interest, and $12,000.00 in late fees.   See Tr. at 76:16-25; id. at 77:5-8 (Bowles, Meacham).

44.     The Downtown Anasazi, as a development project, is in the category of real estate that has "suffered the worst decline due to economic conditions."   Tr. at 93:5-10 (Bowles, Ilfeld)("Any kind of property that was slated for or in the process of being developed . . . generally took the biggest hit").

45.     The Downtown Anasazi was sixty-five percent complete when the FDIC took over Columbian Bank.   See Tr. at 74:6-75:23 (Gerson, Meacham)("The building was only 65 percent complete at best . . .").[15]

---

balances by payments that the lending institutions received before sentencing.  Additionally, were the approximately $4,000,000.00 not deducted from V. Garcia's outstanding balances on his loans with Columbian Bank, the outstanding balance he owes to the FDIC would most likely be much larger.  V. Garcia's outstanding balance on the Lockahven Estate loan is currently $2,998,866,.00, which includes $1,800,000.00 in principal and over $1,100,000.00 in interest in fees.  V. Garcia's principal balance for the Downtown Anasazi loan was $16,000,000.00, but his outstanding balance with the FDIC, for both the Lockhaven Estates and Downtown Anasazi loans, is only $15,430,533.08.  See PSR ¶¶ 18-21, at 6-7 (explaining that V. Garcia originally borrowed $11,000,000.00 from Columbian Bank to fund the Downtown Anasazi, and that the principal was later increased by $5,000,000.00).  If the approximately $4,000,000.00 that Columbian Bank received upon the closing of the Copper Square loan was not already reflected in V. Garcia's total outstanding balance with Columbian Bank, then his outstanding balance would likely be much higher, given that his outstanding balance on the Lockhaven Estates loan has since increased by nearly two-thirds in interest and fees.  The Court concludes, thus, that V. Garcia should not receive a credit, pursuant to U.S.S.G. § 2B1.1, cmt. n.3(E)(i) for the funds that Columbian Bank received upon the closing of the Copper Square loan.

[15] V. Garcia asserts, and the USPO states, that the Downtown Anasazi was more than sixty-five percent complete when Columbian Bank closed.  See PSR ¶ 13, at 4 ("The Anasazi . . . project[] [was] . . . approximately 75 . . . percent complete."); V. Garcia Objections at 11 ("[T]he Anasazi project was 85% complete when the bank was seized by the FDIC.").  The only

46.     If V. Garcia had completed the Downtown Anasazi, it would still have depreciated in value because of the overall depression in the real estate market.  See Tr. at 96:11-17 (Ilfeld); Defense Exhibit A at 2-3 ("If this project were started prior to the 2008 economic downturn a reasonable assessment, in say 2010, [it] would have been that the project's inherent value would at that point in time be severely diminished. . . .  This . . .  would have occurred wholly apart from any other non economic factors . . . .").

47.     V. Garcia attempted to buy back the Downtown Anasazi mortgage note from the FDIC so that he could convert the property into a hotel.  See Tr. at 81:7-83:7 (Bowles, Barela)(Walter Barela, a developer in Albuquerque, explaining that V. Garcia contacted him regarding converting the Downtown Anasazi into a hotel).

48.     V. Garcia was unable to provide the FDIC with a firm offer, backed by a ten percent, non-refundable down payment for the Downtown Anasazi mortgage note.  See Tr. at 68:15-69:18 (Bowles, Meacham)(Meacham stating that he knew V. Garcia discussed offers for purchasing the Downtown Anasazi mortgage note, but that the FDIC required a downpayment of "10 percent . . . nonrefund[]able, in writing" before it would go forward with any offer).

49.     The FDIC did not provide V. Garcia with a firm price for which it would sell the Downtown Anasazi mortgage note to V. Garcia.  See Tr. at 76:8-15 (Bowles, Meacham)(Q: "So you never provided Mr. Garcia with a written price you would accept for Anasazi?"  A: "We just don't do that.").

---

evidence before the Court regarding the Downtown Anasazi's level of completion is the testimony of the FDIC'S resolutions and receivership specialist, Bruce Meacham, who stated that the Downtown Anasazi was sixty-five percent "complete at best."  Tr. at 74:6-75:23 (Meacham). In the absence of evidence to contradict this testimony, the Court concludes that the Downtown Anasazi project, as a whole, was sixty-five percent complete when Columbian Bank closed.

50.     The FDIC did not foreclose on the Downtown Anasazi, but sold the Downtown Anasazi mortgage note to First Southern National Bank for $555,000.00 on July 27, 2011.  See Tr. at 59:4-12 (Gerson, Meacham, Bowles); id. at 68:7-10; 69:11-12 (Meacham, Bowles); PSR ¶ 48, at 19; id. ¶ 48, at 19.

51.     Lockhaven Estates is a development project -- the type of commercial real estate that has suffered the most severe economic losses in the recent housing and mortgage downturn. See Tr. at 93:11-22 (Bowles, Ilfeld); Tr. at 93:5-10 (Bowles, Ilfeld).

52.     As of November 2, 2011, Lockhaven Estates was appraised at $560,000.00.  See Tr. at 62:10-23 (Gerson, Meacham)(reading from Government Exhibit 3[16]).

53.     The FDIC is unlikely to receive the appraisal value of Lockhaven Estates in the current real estate market.  See Tr. at 72:1-3 (Meacham, Bowles)("In this market, we rarely ever get close to appraised value.").

54.     The FDIC intends to sell Lockhaven Estates.  See Tr. at 62:24-63:1 (Gerson, Meacham)(Q: "[I]s it the FDIC's intention ultimately to sell this land . . . to defray some of the losses on the loan?" A: "That's right.").

55.     V. Garcia defaulted on the Copper Square loan in June, 2008.  See Tr. at 38:9-12 (Gerson, Heyward).

56.     When the Copper Square loan went into default, First Financial stopped honoring V. Garcia's draw-down requests.  See Tr. at 38:14-19 (Heyward).

---

[16] Government Exhibit 3 is Beer-Wells-Todd Real Property Analysts, Inc., Appraisal Report of A 66 Lot Manufactured Home Park with 3 Manufactured Homes and 63 Developed lots in the Lockhaven Estates and Approximately 20 acres of Excess Land Within Pierce Addition Unit Two Located Along the East Line of N. Wheaton Street, North of Highway 60/84, In Clovis, Curry County, New Mexico, dated Nov. 2, 2011.

57.    The Copper Square loan was the largest loan in First Financial's portfolio at the time, but V. Garcia's default did not threaten the credit union's ability to stay solvent.  See Tr. at 38:20-25 (Heyward).

58.    First Financial planned to immediately foreclose on Copper Square, but V. Garcia initially responded to the possible foreclosure with threats of a lawsuit alleging lender liability against First Financial.  See Tr. at 39:9-14 (Heyward)("[W]e would have to foreclose on the building, . . . in order to recoup any damages . . . .  Mr. Gar[cia] started telling us about events . . . that would result in accusations and possibility a lawsuit of lender liability."); PSR ¶ 17, at 6 ("V. Garcia threatened to file for bankruptcy, claiming lender liability.").

59.    First Financial agreed to a settlement with V. Garcia, around April, 2009, in which V. Garcia agreed to release all claims of lender liability against First Financial, and which allowed First Financial to foreclose on Copper Square.  See Tr. at 39:19-40:2 (Heyward)("We wanted to foreclose. . . .  [What] we did was to negotiate a settlement with Mr. Garcia that did two things.  One is hold us harmless in the future for any claim for lender liability and consent to judgment on the foreclosure."); id. at 47:1-5 (Bowles, Heyward)(Q: "[W]hat was the approximate dates of that settlement agreement?"  A: "A[pril] of 2009 sounds right."); PSR ¶ 17, at 6.

60.    First Financial paid $250,000.00 to V. Garcia in exchange for V. Garcia's release of any lender liability claims against First Financial.  See Tr. at 53:23-54:2 (Gerson, Heyward)(Q: "[W]ould it be correct to characterize the $250,000 payment that your bank made to Mr. Garcia or to Co[p]per square as being for a release from a potential lender liability claim?" A: "Yes.").

- 19 -

61.     First Financial foreclosed on Copper Square in May, 2010.  See PSR ¶ 39, at 15.

62.     The FDIC did not receive any value from Copper Square's foreclosure, because Columbian Bank was the second lien holder on the property.  See Tr. at 60:14-21 (Gerson, Heyward)(Q: "[I]s that to say that the receiver on Columbian bank and trust did not receive any value?" A: "That's correct."  Q: "Upon those foreclosures?" A: "No value.").

63.     Copper Square was appraised at $5,675,000.00 in January, 2010.  See Tr. at 42:21-43:9 (Gerson, Heyward)(reading from Government Exhibit 1[17]).

64.     An August 4, 2011 Copper Square was appraised at $1,600,000.00.  See Tr. at 41:12-23; id. at 43:8-44:3 (Gerson, Heyward)(reading from Government Exhibit 2[18]).

65.     Market conditions have changed from the time First Financial had Copper Square appraised in January, 2010, and August 4, 2011, which contributed to the property's decrease in value.  See Tr. at 49:10-50:4 (Bowles, Heyward)(Q: "[T]here was talk about this property dropping in value but that was due to market conditions correct?" A: "Yes.").

66.     First Financial is asking $3,000,000.00 for Copper Square.  See  Tr. at 54:3-6 (Gerson, Heyward); PSR ¶ 53, at 20.

67.     First Financial estimates that, if Copper Square sold for $2,000,000.00, First Financial would have approximately $200,000.00 to $300,000.00 worth of expenses, including:

---

[17] Government Exhibit 1 is John F. Howden and Assoc., Restricted Use Report: an Appraisal of the Office Condominium Project, Formerly Known as Copper Square 500 Copper Avenue NW, Albuquerque, Bernalillo County, New Mexico, 87102, dated Jan. 22, 2010.

[18] Government Exhibit 2 is Integra Realty Resources, Appraisal of Real Property: Copper Square, dated Aug. 4, 2011.

"closing costs, environmental reports, appraisals, survey[s], [and] broker fees."  Tr. at 44:17-21 (Heyward).

68.    First Financials' expenses in closing on Copper Square will vary with the actual sale price.  See Tr. at 45:1-6 (Gerson, Heyward)(Q: "[I]f the sale price were different your ultimately numbers would obviously be different as well . . . ?" A: "Yes that's correct . . . .").

69.    V. Garcia appraised his personal residence at a value of $800,000.00 before it went into foreclosure.  See Tr. at 127:19-24 (Bowles, Garcia); id. at 128:2-4 (Bowles, Garcia); PSR ¶ 60, at 23 (noting that V. Garcia's personal residence was appraised at $800,000.00 as of September 1, 2011).

70.    V. Garcia's personal residence was sold in foreclosure in March, 2011 for $551,000.00, which was less than the value of the first mortgage on his home.  See Tr. at 72:7-19 (Gerson, Meacham)(Q: "Was the house sold at auction, do you know?"  A: "It was . . . a[t] [a] sheriff[']s sale . . . in March of 2011, and it was . . . foreclosed and it was bid in by the . . . mortgage holder.  There [were] no competing bids."  Q: "They bid $555,000?"  A: "I think it was $551,000.").

71.    The FDIC did not bid in the foreclosure on V. Garcia's personal residence; the FDIC holds the second mortgage, the first mortgage exceeded the appraised value of V. Garcia's personal residence, and the FDIC could not make a profit through bidding on the foreclosure.  See Tr. at 73:23-25 (Meacham)("[T]he first mortgage was far in excess of what we considered the appraised value, so it was . . . it was not prudent to buy the first mortgage.").

- 21 -

72.     V. Garcia believes that, at the time he pledged personal property and assets to Columbian Bank the value of that collateral was between $7,000,000.00 and $10,000,000.00. See Tr. at 110:18-23 (Garcia).

73.     The current balance in V. Garcia's Wells Fargo personal checking account is approximately $100.00.   See Tr. at 124:22-23 (Garcia).   Cf. PSR ¶ 88, at 33 (listing value as $459.00 as of October, 2011).

74.     The current value in V. Garcia's Wells Fargo commercial checking account is approximately $50.00.   See Tr. at 124:23-25 (Garcia).   Cf. ¶ PSR 88, at 33 (listing value as $258.00 as of October, 2011).

75.     V. Garcia could not testify with certainty regarding the USPO's estimations in the PSR that he received approximately $16,500.00 from the sale of a Lexus and gold and silver coins.   See Tr. at 124:24-125:1 (Garcia)("I don't know.   It says cash assets sold.   I'm not sure what that refers to.")(citing PSR ¶ 88, at 33).   Cf. PSR ¶ 88, at 33; id. ¶¶ 89-90, at 36 (listing $14,000.00 which V. Garcia acquired from the sale of a Lexus, and $12,500.00 which V. Garcia acquired from the sale of gold and silver coins).

76.     V. Garcia's artwork and paintings are currently worth between $50,000.00 and $75,000.00. See Tr. at 125:3-6 (Garcia).   Cf. PSR ¶ 88, at 33 (listing the value of approximately 50 to 60 pieces of artwork at $75,000.00).

77.     V. Garcia's coin collection is currently worth approximately $20,000.00.   See Tr. at 125:6-10 (Garcia, Bowles).   See PSR ¶ 88, at 33 (listing the value of V. Garcia's coin collection as $20,000.00).

78.     V. Garcia's jewelry is currently worth approximately $5,500.00.  <u>See</u> Tr. at 125:11 (Garcia).  <u>See</u> PSR ¶ 88, at 33 (listing the value of V. Garcia's jewelry as $5,500.00).

79.     V. Garcia's furniture, fixtures, and equipment are worth approximately $5,000.00.  <u>See</u> Tr. at 125:12-15 (Garcia, Bowles)(A: "Furniture[,] fixtures[,] and equipment, $22,500, I would say that that's gone down through the sale of some items to about $5,000.")(citing PSR ¶ 88, at 33).  <u>Cf.</u> PSR ¶ 88, at 33 (listing the value of V. Garcia's furniture, fixtures, and equipment as $22,500.00).

80.     V. Garcia's knife collection is worth approximately $8,500.00.  <u>See</u> Tr. at 125:16 (Garcia).  <u>See</u> PSR ¶ 88, at 33 (listing the value of V. Garcia's knife collection as $8,500.00).

81.     V. Garcia's 1974 Mercedes Benz 450 SL is currently worth approximately $25,000.00.  <u>See</u> Tr. at 125:16-22 (Garcia, Bowles).  <u>See</u> PSR ¶ 88, at 33 (listing the value of V. Garcia's 1974 Mercedes Benz 450 SL as $25,000.00).[19]

82.     V. Garcia's 1994 Mercedes Benz 600 SL is worth approximately $5,000.00.  <u>See</u> Tr. at 125:23-126:6 (Garcia, Bowles).  <u>Cf.</u> PSR ¶ 88, at 33 (listing the value of V. Garcia's 1994 Mercedes Benz 600 SL as $8,000.00).

83.     The current value of V. Garcia's "Vehicle (unknown model/type)" is $7,000.00.  PSR ¶ 88, at 33.  <u>See</u> Tr. at 125:23-126:7 (Bowles, Garcia).  <u>Cf.</u> PSR ¶ 92, at 36 (stating that V.

---

[19] According to the National Automobile Dealers Association, a 1974 Mercedes Benz 450 SL has an average retail value of $17,000.00, but may be worth $9,650.00 at the low end, and $24,100.00 at the high end of the retail spectrum.  <u>See</u> NADA Guides, 1974 Mercedes-Benz 450 SL (Mar. 13, 2013), <u>available at</u> http://www.nadaguides.com/Classic-Cars/1974/Mercedes-Benz/450SL/2-Door-Roadster/Values.  The Court does not use the NADA Guides information to make a finding of fact, as neither party submitted the NADA Guide into evidence.  Rather, the Court notes that V. Garcia's estimate although at the high end of the retail spectrum, is not unfeasible.  Additionally, the United States has presented no evidence to rebut V. Garcia's estimate of the value of his 1974 Mercedes Benz 450 SL.

Garcia possesses a vehicle of unknown model/type with an approximate fair market value between $7,000.00 and $10,000.00).

84.     V. Garcia's Scotttrade Brokerage Account currently contains approximately $250.00.  See Tr. at 126:8-9 (Garcia)(A: "The next page Scott[]trade brokerage account is $250.")(citing PSR ¶ 88, at 34).  Cf. PSR ¶ 88, at 34 (listing the value of V. Garcia's Scottrade Brokerage Account as $1,107.40).

85.     V. Garcia's Oppenheimer Funds IRA currently contains approximately $2,200.00. See Tr. at 126:9 (Garcia)(A: "Oppenheimer funds IRA is $2,20[0].")(citing PSR ¶ 88, at 34).  Cf. PSR ¶ 88, at 34 (listing the value of V. Garcia's Oppenheimer Funds IRA as $3,219.08).

86.     V. Garcia's interest in Biotech Partners LLC is currently worth approximately $31,550.00 or higher.  See Tr. at 126:9-14 (Garcia, Bowles).  Cf. PSR ¶ 88, at 34 (listing the value of V. Garcia's interest in Biotech Partners LLC as $31,550.00).

87.     V. Garcia's interest in White Oak investments is currently worth approximately $150,000.00.  See Tr. at 126:15-19 (Garcia).  See PSR ¶ 88, at 34 (listing the value of V. Garcia's interest in White Oak investments as $150,000.00)

88.     The current value of V. Garcia's current business endeavor, Wisdoms by Vincent, is approximately $50,000.00.  See Tr. at 127:7-14 (Bowles, Garcia); PSR ¶ 88, at 34 (listing the value of Wisdoms by Vincent as $50,000.00).

89.      The value of V. Garcia's American Life Settlements life insurance policies are approximately $324,000.00.  See Tr. at 127:16-18 (Garcia, Bowles); PSR ¶ 88, at 34 (listing the value of V. Garcia's American Life Settlements policies as $324,000.00).

- 24 -

90.     The FDIC has not yet received any value to off-set its losses on the Downtown Anasazi from V. Garcia's personal guarantees on his loan with Columbian Bank.  See Tr. at 59:21-60:4 (Gerson, Meacham); id. at 60:22-61:1 (Gerson, Meacham).

91.     Besides the $555,000.00 from the sale of the Downtown Anasazi mortgage note, the FDIC's losses in the Downtown Anasazi have not been offset by any other sources of value.  See Tr. at 60:22-61:1 (Gerson, Meacham).

92.     V. Garcia owes subcontractors approximately $1,550,000.00.  See V. Garcia Objections at 13.  Cf. PSR ¶ 56, at 20 (listing the amount that V. Garcia owes subcontractors as $2,520,302.61).[20]

## PROCEDURAL BACKGROUND

V. Garcia was indicted on nineteen counts, and has pled guilty to one -- bank fraud in connection with the purchase of the J&J Casino.  See Indictment, filed June 10, 2010 (Doc. 2); Plea Agreement, filed August 29, 2011 (Doc. 76).   V. Garcia was charged with bank fraud, money laundering, and laundering of money instruments.  His crime occurred in a time of economic tumult across the country, and the parties dispute how much pecuniary harm should be attributed to him.

---

[20] V. Garcia disputes the amount that the USPO reports he owes to subcontractors for work.  See V. Garcia Objections at 13 (arguing that the USPO incorrectly reports that he owes $2,520,302.61, and estimating that he owes subcontractors $1,550,000.00).  Neither the USPO nor V. Garcia have provided evidence that supports their estimates for the amount that V. Garcia owes subcontractors.  Accordingly, the Court cannot conclude that either figure is correct, or closer to an accurate figure.  The burden is on the United States to prove its estimate of the amount of loss, and because the United States has not presented evidence to support a greater figure than that which V. Garcia sets forth, the Court cannot conclude that V. Garcia owes more than $1,550,000.00.

1.      **V. Garcia's Plea Agreement**.

On August 19, 2011, V. Garcia entered into a Plea Agreement.  V. Garcia pled guilty to count three of the Indictment, the allegation that he committed Bank Fraud, in violation of 18 U.S.C. § 1344(2), through the devising and utilizing a "scheme and artifice to obtain moneys, funds, credits, assets, securities and other property owned by and under the control of . . . Columbian Bank and Trust . . . by means of false and fraudulent pretenses, representations and promises."  Indictment ¶ 1, at 1.  See Plea Agreement ¶ 3, at 2.  V. Garcia admits that he "executed a plan to obtain funding from the Columbian Bank & Trust Co. by means of false representations," by directing his associate, Barnhill, to "submit a bank construction loan draw-down request containing a material false statement . . . ."  Plea Agreement ¶ 8(a), at 4.  To address Columbian Bank's concerns about his liquidity, V. Garcia admits that he directed Barnhill to request a construction loan draw down in the amount of $365,677.00, which falsely informed Columbian Bank that the "funds were needed for 'materials and price lock' for construction services to be provided by a company called DevCorp., Inc.," for the construction of the Downtown Anasazi project.  Plea Agreement ¶¶ 8(b), 8(c) at 4.  In reality, V. Garcia used the funds to "purchase an interest in a casino in the State of Washington."  Plea Agreement ¶ 8(b), at 4.  V. Garcia intended to provide additional funds to complete the Downtown Anasazi project if the casino were successful.  See Plea Agreement ¶ 8(c), at 4.  The United States and V. Garcia stipulate that the "gross loss amount in this case is $842,237.44."  Plea Agreement ¶ 10(b), at 6. The parties also stipulate that the net loss V. Garcia's offense caused should be determined pursuant to U.S.S.G. § 2B1.1, cmt. n.3(E)(i) and (ii).  See Plea Agreement ¶ 10(c).  V. Garcia waives his right to appeal his conviction "and any sentence, including any fine, within the

statutory maximum authorized by law, as well as any order of restitution entered by the Court."
Plea Agreement ¶ 13, at 8.

>    2.    **The Presentence Investigation Report.**

On February 3, 2012, the United States Probation Office disclosed its Presentence
Investigation Report.  The USPO determines that V. Garcia's base offense level is 7, pursuant
U.S.S.G. § 2B1.1(a)(1), because his conviction of bank fraud under 18 U.S.C. § 1344(2) carries a
maximum penalty of 30 years imprisonment.  See PSR ¶ 59, at 21.  The USPO applies an
increase to V. Garcia's base offense level for specific offense characteristics, pursuant to
U.S.S.G. § 2B1.1(b)(1).  See PSR ¶ 60, at 21-22.  The USPO determines that V. Garcia knew, or
should have known, that his conduct would result in actual losses of $23,550,835.69.  The USPO
bases this determination on certain statements in the PSR from cooperating witnesses that
indicate that V. Garcia was misusing Blue Dot's loan funding to pay for personal expenses.  See
PSR ¶¶ 13-15, at 4-5.  The USPO also states that V. Garcia spent the down payments he received
on Downtown Anasazi presales.  See PSR ¶ 15, at 5.  The USPO states that V. Garcia diverted a
"significant portion" of the loan proceeds from Lockhaven Estates to purchase the J&J Casino,
and that V. Garcia sent the furniture used in the Lockhaven Estates model homes to the J&J
Casino.  PSR ¶ 15, at 5.  The USPO states that V. Garcia had no interest in completing the
Downtown Anasazi.  See PSR ¶ 15, at 5.  The USPO states that V. Garcia took contractor profits
in advance when the First Financial loan closed and took $450,000.00 "directly to his pocket."
PSR ¶ 16 at 6.  According to the USPO, before V. Garcia defaulted on the Copper Square loan,
First Financial discovered that V. Garcia was submitting invoices for work that First Financial
had already paid for separately.  See PSR ¶ 16, at 6.  The USPO states that First Financial

wanted to purchase Copper Square after V. Garcia defaulted on his loan, but that it could not, because Columbian Bank held a $16,000,000.00 lien on the property. See PSR ¶ 17, at 6. The USPO indicates that V. Garcia used loan proceeds for personal gain. See PSR ¶ 29, at 10. The USPO states that no money from the Lockhaven Estates loan left the office without V. Garcia's personal knowledge and that V. Garcia directed Barnhill to create fraudulent invoices. See PSR ¶¶ 31-32, at 13. The USPO states that V. Garcia would transfer funds amongst banks to hide their origin. See PSR ¶ 36, at 15. The USPO also lists all liens filed against Blue Dot and the Downtown Anasazi by subcontractors for allegedly unpaid work as part of the actual losses V. Garcia's offense caused. See PSR ¶ 30, at 10-13; id. ¶¶ 55-56, at 20.

The USPO also determines that the following credits should be applied to the actual losses, pursuant to U.S.S.G. § 2B1.1 cmt. n.3(E): (i) $555,000.00 that the FDIC received from the acquisition of the Downtown Anasazi loan; (ii) $1,600,000.00 -- the market value of the Copper Square property as of August 4, 2011; (iii) $800,000.00 -- the market value of V. Garcia's personal residence as of September 1, 2011, which V. Garcia pledged as collateral to secure the $16,000,000.00 with Columbian Bank; and (iv) $500,000.00 -- the value of personal property and assets against which V. Garcia granted Columbian Bank a lien for the securing of the loans. See PSR ¶ 60, at 23. The USPO, thus, calculates that the actual (net) loss in this case is $20,650,835.69. The USPO concludes that the actual loss and intended loss that V. Garcia's offense caused is the same, because there is no evidence he intended to cause more loss beyond that which the USPO sets forth. The USPO notes that, pursuant to U.S.S.G. § 2B1.1(b)(1)(L), if the loss exceeds $20,000,000.00, the base offense level should be increased by 22. The USPO does not apply this increase, however, because the parties stipulated in the Plea Agreement that

the gross loss in this case is $842,237.44.  The USPO calculates that the parties' stipulated gross losses, minus V. Garcia's credits, amounts to a net loss of negative $2,057,762.56.  The USPO, thus, determines that an adjustment under U.S.S.G. § 2B1.1(b)(1) for the amount of loss V. Garcia's offense caused is not warranted.  See PSR ¶ 60, at 24.

The USPO increases V. Garcia's base offense level 2 levels, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), finding that the offense involved twenty-four identifiable victims: two financial institutions and twenty-two subcontractors.  See PSR ¶ 61, at 24.  The USPO increases V. Garcia's offense level to 12, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), because V. Garcia used sophisticated means to commit bank fraud by falsifying the invoices upon which the draw downs were based.  See PSR ¶ 62, at 24.  The USPO does not increase V. Garcia's offense level pursuant to U.S.S.G. § 2B1.1(b)(15)(B), for having substantially jeopardized the safety and soundness of a financial institution, as may be evidenced by the financial institution becoming insolvent, because, although Columbian Bank closed on August 22, 2008, "it does not appear his conduct led to the Columbian Bank and Trust's [in]solvency. . . .  Columbian [B]ank was experiencing deficiency in their management, asset quality, liquidity and supervision practices prior to Mr. Garcia['s] loan acquisition in 2006."  PSR ¶ 63, at 26.  The USPO also does not adjust V. Garcia's offense level based upon his role, pursuant to U.S.S.G. § 3B1.1, because, the USPO cannot determine whether V. Garcia fully directed Barnhill, given that both Barnhill and V. Garcia received a portion of the proceeds from the bank fraud.  See PSR ¶ 65, at 26-28.  The USPO thus calculates that V. Garcia's adjusted offense level is 12.  See PSR ¶ 67, at 28.  V. Garcia receives a 2-level reduction for acceptance of responsibility, pursuant to U.S.S.G. §

3E1.1.  See PSR ¶ 68, at 28.  According to the USPO, V. Garcia's total offense level is, therefore, 10.  See PSR ¶ 69, at 28.

V. Garcia has no criminal history points; therefore, his criminal history category is I.  See PSR ¶ 72, at 28.  Based on an offense level of 10 and criminal history category of I, V. Garcia's guideline imprisonment range is 6 to 12 months.  See PSR ¶ 105, at 38.  V. Garcia is not eligible for probation, because he is convicted for a Class B felony, pursuant to 18 U.S.C. § 3561(a)(1), see U.S.S.G. § 5B1.1(b)(1).  The USPO notes that, had the parties not stipulated to a gross loss amount of $842,237.44, V. Garcia's offense level would have been increased by 22-levels, making his total offense level 31.  Were V. Garcia's offense level 31 and criminal history category I, his guideline imprisonment range would be 108 to 135 months.  See PSR ¶ 106, at 39.

Pursuant to 18 U.S.C. § 1344(2) the guideline range for a fine for V. Garcia's offense is between $2,000.00 and $1,000,000.00.  See PSR ¶¶ 111, 113 at 40.  The USPO states that V. Garcia does not have the ability to pay any fines, given that his debts far outweigh his assets. The USPO notes, however, that the Mandatory Victims Restitution Act of 1996, 18 U.S.C. § 3572, requires the Court to "enter restitution without consideration of the defendant's ability to pay and without consideration of the costs of collection efforts to the Department of Justice." PSR ¶ 103, at 38.  See id. ¶ 115, at 40-41.  The USPO states that V. Garcia's assets should be used for victims' restitution.  See PSR ¶ 103, at 38.  The USPO calculates that V. Garcia owes $23,550,835.69 in restitution.  The USPO determines that V. Garcia owes $15,430,533.08 to the FDIC, $5,600,000.00 to First Financial, and $2,520,302.61 to twenty-two contractors.  See PSR ¶ 116, at 41.  The USPO states that the Court may set a deadline for additional restitution claims

to be submitted to the USPO, no later than ninety days after V. Garcia is sentenced, pursuant to 18 U.S.C. § 3664(d)(5).  See PSR ¶ 120, at 42.  The USPO recommends that if V. Garcia owes restitution after being released from custody, his monthly restitution payments should be no less than twenty-five percent of his net monthly income.  See PSR ¶ 116, at 41.

The USPO states that an upward departure may be warranted in this case, because the gross loss amount to which the parties stipulated "substantially under-represents the actual harm caused."  PSR ¶ 22, at 43.  The USPO identifies that, pursuant to U.S.S.G. § 5K2.0(a)(3), a departure may be warranted "in an exceptional case, even though the circumstances that form[] the basis for the departure is taken into consideration in determining the guideline range," if the Court determines that the circumstance is in the offense "to a degree . . . substantially in excess of [] . . . that which ordinarily is involved in that kind of offense."  PSR ¶ 121, at 43.  The USPO states that the gross loss amount that V. Garcia's offense caused is $23,550,835.69, yet the parties stipulated to a gross loss amount of $842,237.44.  The UPSO further notes, that had V. Garcia's offense level been determined based upon the actual gross loss that it finds his offense caused, his guideline imprisonment range would be 108 to 135 months.  The USPO thus states that the "Court could consider departing upward to a guideline imprisonment sentence no more than the maximum statutory penalty of 30 years."  PSR ¶ 122, at 43.

The USPO also determines that a downward departure is not warranted in V. Garcia's case.  The USPO notes that, pursuant to U.S.S.G. § 5K2.20, the Court may depart downward if V. Garcia had "committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life."  PSR ¶ 123, at 43.  See

U.S.S.G. § 5K2.20.  The USPO states that, although V. Garcia's involvement "could be considered a marked deviation from an otherwise law-abiding life," his offense was "not committed without significant planning nor was it for a limited duration," as V. Garcia's criminal activity began in December 2006, and continued through May, 2008.  PSR ¶ 123, at 43.  The USPO notes that it took significant planning to orchestrate the fraudulent invoices and to transfer funds from one lender to another.  The USPO thus asserts that a downward departure is not warranted under U.S.S.G. § 5K2.20 for V. Garcia.  See PSR ¶ 123, at 43.

###    3.    The United States' Objections to the PSR.

The United States objects to the USPO's calculation of the gross loss amount in the PSR.  The United States notes that the parties stipulated to a gross loss amount of $842,237.44 and that, pursuant to U.S.S.G. § 2B1.1, cmt. n.3(E)(i), certain credits may be applied to reduce the gross loss amount.  The United States states that the parties have not agreed upon the net loss amount, and thus the Court should determine the net loss amount, to which the parties may object.  The United States objects to the USPO's determination of the "the gross loss . . . , the offsetting credits . . . ," and how the credits were "applied to the gross loss."   U.S. Objections at 1.

The United States contends that the gross loss amount based upon V. Garcia's relevant conduct is $842,237.44.  The United States calculates the gross loss amount from the value of V. Garcia's draw down from Columbia in the amount of $365,677.00 -- the offense of conviction -- and V. Garcia's total draw-down requests based upon fraudulent line items.  The United States asserts that counts one, two, and four through seven of the Indictment are based upon draw-downs with fraudulent line items, and thus the total losses from those draw downs amounts to all "'harms that resulted from' the offense of conviction, together with all harms that resulted from

acts that were 'part of the same course of conduct or common scheme or plan as the offense of conviction.'"   U.S. Objections at 2-3 (quoting U.S.S.G. § 1B1.3(a)(1), (2), (3)).   The United States includes a chart that lists the portion of V. Garcia's draw-down requests alleged in counts one through seven that are based upon fraudulent line items:

| Count | Draw Request | Fraudulent Line Item(s) |
|:---:|:---|:---|
| 1 | Lockhaven Estates Draw #12, submitted to CBT on 12/20/06, $110,926.28 | Fraudulent     Qwest     invoice     for $42,323.00 |
| 2 | Lockhaven Estates Draw #13, submitted to CBT on 1/23/07, $83,526.11 | Fraudulent   Cox   Communications invoice for $38,419.00 |
| 3 | Anasazi   LLC   Draw   #13, submitted to CBT on 2/13/07, $365,677.00 | Fraudulent   DevCorp   invoice   for $365,677.00 (sole line item in draw request)(count of conviction) |
| 4 | Copper Square LLC Draw #2 submitted to CBT on 7/30/07, $167,717.31 | Various   invoices   for   construction performed at home of defendant's son, David Garcia, totaling $62,156.52 |
| 5 | Copper Square LLC Draw #6 submitted to CBT on 8/15/07, $144,478.80 | Fraudulent R&D Perfection Cleaning invoice for $144,478.80 (sole line item in draw request) |
| 6 | Copper Square LLC Draw #5 submitted to CBT on 10/18/07, $174,453.62 | Various   invoices   for   construction performed at home of defendant's son, David Garcia, totaling $61,183.12 |
| 7 | Copper Square LLC Draw #2 submitted to FFCU on 5/15/08, $213,471.25 | Fraudulent Jay Lial A/C invoice for $128,471.25 |

U.S. Objections at 4.  The United States asserts that $842,237.44 is the total value of V. Garcia's fraudulent transactions in counts one, two, and four through seven, and thus that amount should be V. Garcia's gross loss amount based upon his relevant conduct.  See U.S. Objections at 3-4. The United States contends that the USPO erred by not providing an explanation for the parties

stipulated gross loss amount in the PSR, in that, without the explanation, the PSR "gives the unfortunate impression that the parties had no factual basis for the stipulated loss amount."  U.S. Objections at 4.

The United States also asserts that the USPO should not have included the unpaid balances of V. Garcia's Columbian Bank and First Financial loans, or the contractors' liens, in the gross loss amount.  The United States contends that these losses might have arisen from V. Garcia's relevant conduct "if the defendant had been charged with having obtained the construction loans by fraud, because the losses would have been the foreseeable result of the defendant's misconduct in obtaining the loans."  U.S. Objections at 5.  The United States argues that, because V. Garcia pled only to "having executed a scheme and artifice to defraud by incorporating false line items into draw requests . . . .  the losses to the banks beyond the false line items in the draw request" are not part of V. Garcia's relevant conduct.  U.S. Objections at 5.  The United States thus argues that the gross loss amount from V. Garcia's offense should be $842,237.44.  See U.S. Objections at 4.

The United States also objects to the USPO's calculation of V. Garcia's credits as totaling $2,900,00.00.  The United States contends that the USPO should not have accepted V. Garcia's information regarding the value of his assets.  The United States further contends that the $1,600,000.00 applied as credits that is based upon the value of Lockhaven Estates is overstated, because Lockhaven is "an incompletely developed trailer park . . . ."  U.S. Objections at 5-6.  The United States also asserts that the USPO overstated the value of Lockhaven Estates and V. Garcia's personal residence.  The United States asserts that the actual value of these

properties can only be determined through an evidentiary hearing.  The United States requests an evidentiary hearing regarding the value of these properties.  See United States Objections at 6.

The United States also objects to the USPO's calculation that the net loss in this case is $0.00, based upon the USPO's determination that V. Garcia's credits exceed the stipulated gross loss amount.  The United States asserts that the USPO erred by not adjusting V. Garcia's offense level based upon the net loss in the case, pursuant to U.S.S.G. § 2B1.1, cmt. n.3(A)(i).  The United States asserts that the Court should determine that the net loss in this case exceeds $400,000.00, but is less than $1,000,000.00, and that V. Garcia's offense level should accordingly be increased 14 levels pursuant to U.S.S.G. § 2B1.1(b)(1).  The United States asserts that the parties stipulated to a non-binding methodology for calculating the net loss amount: "'The net loss amount in this case should be determined by the application of credits pursuant to U.S.S.G. § 2B1.1, cmt. n.3(E)(i) and (ii) against the gross loss amount.'"  U.S. Objections at 7 (quoting Plea Agreement ¶ 10(d), at 6).

The United States asserts that, pursuant to U.S.S.G. § 2B1.1, cmt. n.2(c), which requires a court to make only a reasonable estimate of the loss amount, the "reasonable way to allocate the credits in this case is to prorate them between relevant categories of losses."  U.S. Objections at 7-8.  The United States states that the total losses to banks and lienholders was $23,550,836.69.  See U.S. Objections at 8 (citing PSR ¶ 60, at 22).  The United States asserts that the $842,237.44 amount in gross loss arising from criminal activity, as the parties have stipulated, is approximately $0.036 per dollar lost.  The United States argues, thus, $0.036 of each dollar in credit should apply towards the gross loss amount, not the entirety of the value of V. Garcia's credits.  See U.S. Objections at 8.

The United States contends that the USPO's reduction of the gross loss amount by the entire value of V. Garcia's credits is an incorrect calculation. The United States argues that it is not reasonable to apply the full amount of V. Garcia's credits to his gross loss amount. The United States asserts that "a fair allocation of $2.9 million in credits would result in a net loss of $738,526.10 for purposes of the criminal case," although the United States objects to this amount of credits. U.S. Objections at 9. The United States asserts that the USPO's approach to the calculation of the net losses "puts the fraud losses at the front of the line for pairing off with available credits, and tells the other losses that they must wait to be made whole out of whatever is left after the fraud losses have been satisfied." U.S. Objections at 9. The United States contends that its proposed approach "puts every dollar of loss on an equal footing with every other dollar, and would permit all categories of losses to share equally in the available credits." U.S. Objections at 9.

The United States states that the USPO is not bound by any stipulation in the Plea Agreement regarding the calculation of the net loss amount. The United States asserts, however, that U.S.S.G. § 2B1.1, cmt. n.3(E)(i) and (ii) do not "mandate the PSR's approach to the calculation of net loss in this case." U.S. Objections at 10. The United States asserts, thus, that the USPO's calculation of the net loss amount based upon all of the loss incurred and all of the collateral pledged and property returned does not create a reasonable estimate of the net loss amount. See U.S. Objections at 10. The United States requests, thus, that the Court hold an evidentiary hearing regarding the value of V. Garcia's credits, and that the Court conclude that the net loss amount exceeds $400,000.00 but is less than $1,000,000.00. See U.S. Objections at 11.

4.      **V. Garcia's Objections to the PSR**.

V. Garcia objects to the PSR on a number of bases.  He first objects to the USPO's calculation of gross losses as $23,550,835.69.  V. Garcia contends that, "in addition to what the government stated in opposing the PSR's calculation," the USPO incorrectly failed to reduce the gross loss amount by the amounts accrued from interest, finance charges, late fees, penalties, and similar costs.  See V. Garcia Objections at 1 (citing United States v. Dunn, 300 F. App'x 336, 338-39 (6th Cir. 2008)(unpublished); United States v. Morgan, 376 F.3d 1002, 1014 (9th Cir. 2004)).

V. Garcia also objects to the United States' approach to dividing his credits on a pro rata basis.  V. Garcia contends that neither the guidelines nor case law provides a basis for a pro rata reduction of his credits.  V. Garcia argues that, pursuant to U.S.S.G. § 2B1.1, cmt. n.3(E), his credits "'shall'" be credited towards the gross loss amount.  V. Garcia Objections at 2 (quoting U.S.S.S.G. § 2B1.1, cmt. n.3(E)).  V. Garcia agrees with the USPO's application of the entire value of his credits against the gross loss amount, although he contends that the USPO improperly calculates the gross loss amount as more than the stipulated gross loss amount.  See V. Garcia Objections at 2-3.  V. Garcia asserts that, under U.S.S.G. § 2B1.1, cmt. n.3(E)(i), the gross losses should be reduced by the money and property he and those acting with him returned, and that credits based upon pledged collateral should be determined by the fair market value of the collateral at the time of his sentencing.  V. Garcia asserts that the intended loss should be reduced by the "value of real property used to collateralize the fraudulently obtained loan."  V. Garcia Objections at 4 (citing United States v. Lane, 323 F.3d 568, 590 (7th Cir. 2003); United States v. Downs, 123 F.3d 6347, 624-44 (7th Cir. 1997)).  V. Garcia contends that he provided

- 37 -

documentation of the fair market value of all the pledge collateral, and he identified all of the money he returned, which the USPO accurately calculated in the PSR. V. Garcia argues that, thus, his offense level should not be increased by 14 levels, as the United States argues, because the net loss amount is $0.00 after the credits are accounted. See V. Garcia Objections at 4.

V. Garcia also takes issue with the sentencing guidelines provision which allows a 14-level increase for net loss amounts over $400,000.00 but less than $1,000,000.00. V. Garcia contends that "[t]here is no basis in empirical data or national experience to increase the offense level by 14 levels for the supposed amount of loss, even assuming there was a net loss amount close to $400,000.00." V. Garcia Objections at 4. V. Garcia asserts that the increase "furthers no purpose of sentencing." V. Garcia Objections at 4. He further contends that the increase was implemented on the basis of outside pressure from former sentencing commission commissioners. See V. Garcia Objections at 4. V. Garcia requests the Court to sustain his and the United States' objections to the PSR regarding the gross loss amount, and to accept the stipulated gross loss amount of $842,237.44. V. Garcia further argues that the Court should sustain his objection of applying the total value of his credits to the gross loss amount, resulting in a net loss, as the USPO calculates. See V. Garcia Objections at 6.

V. Garcia also objects to the inclusion of reported losses from Mountain Shadows Construction, Grant & Associates, Mechanical, Inc., and Pace Iron Works, Inc. in the gross loss amount. See V. Garcia Objections at 6. These entities submitted victim impact statements to the USPO, asserting combined losses of $2,520,302.61, because of V. Garcia's criminal activities. See PSR ¶ 56, at 20. V. Garcia contends that the "then prevailing economic climate," not his actions, caused the losses that these entities sustained. V. Garcia Objections at 6. V. Garcia

asserts that these entities' losses were not reasonably foreseeable pecuniary harm, as the USPO characterizes them, because "nobody reasonably could foresee the economic climate that was to come and the failure of developments across the country." V. Garcia Objections at 6. In support, V. Garcia asserts that, without any of his criminal activity, "the Anasazi Building would have dropped in value to the point of being upside down." V. Garcia Objections at 6. V. Garcia further asserts that his actions likely did not cause Columbian Bank's losses. V. Garcia contends that Columbian Bank suffered losses "because of market conditions and poor lending practices." V. Garcia Objections at 7. V. Garcia further asserts that he attempted to finish the Downtown Anasazi, and even offered to pay off the Columbian Bank loan, but the FDIC chose to sell V. Garcia's Columbian Bank loan to First Southern Bank instead. See V. Garcia Objections at 7.

V. Garcia also objects to the USPO's statement that an upward departure may be warranted given that he stipulated to a gross loss amount far lower than the total monetary loss that his actions caused. See V. Garcia Objections at 7 (citing PSR ¶ 122, at 43). V. Garcia asserts that he is not responsible for the total amount of losses alleged in this matter, because "[e]conomic conditions beyond his control which plagued the national market, contributed to the remaining losses above and beyond the $842,000 agreed to by the parties." V. Garcia Objections at 8. V. Garcia contends that theses additional losses should not be attributed to him as relevant conduct pursuant to U.S.S.G. § 1B1.3, because it "was not reasonably foreseeable to Mr. Garcia, or anyone, that the market would fail." V. Garcia Objections at 8.

V. Garcia further asserts that First Financial is not a victim, as the USPO categorizes it. V. Garcia contends that he entered into a settlement and confidentiality agreement with First

Financial, and thus First Financial is not a victim.  See V. Garcia Objections at 8 (citing PSR ¶¶ 50-54, at 19-20).

V. Garcia also objects to the 2-level increase that the USPO attaches pursuant to U.S.S.G. § 2B1.1(b)(2)(A), based upon the number of victims being more than ten.  See V. Garcia Objections at 8 (citing PSR ¶ 61, at 24).  V. Garcia contends that First Financial is not a victim, and that the PSR only lists four victims, separate from the subcontractors, which V. Garcia asserts are not victims of the crime to which V. Garcia pled guilty.  V. Garcia contends that, under U.S.S.G. § 2B1.1, cmt. n.1, a victim is any person, entity, or corporation, that sustained any part of the "actual loss," and that "actual loss" refers to all "reasonably foreseeable pecuniary harm that resulted from the offense."  V. Garcia Objections at 9 (emphasis in original)(secondary quotations omitted).

V. Garcia also objects to the USPO's increase of his offense level to 12, pursuant to U.S.S.G. § 2B1.1(b)(10)(C), for his use of "sophisticated means" to commit his offense.  V. Garcia Objections at 9 (citing PSR ¶ 62, at 24).  V. Garcia asserts that, as stated in the Plea Agreement, he was not aware of the content of the invoices which Barnhill submitted to secure the draw downs.  See V. Garcia Objections at 9 (citing Plea Agreement ¶ 8(b), at 4).  V. Garcia asserts that using "sophisticated means. . . refers to an 'especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense,'" which he did not do, because he did not execute or conceal bank fraud in a complex or intricate manner.  V. Garcia Objections at 9-10 (quoting United States v. Snow, 663 F.3d 1156 (10th Cir. 2011)).

V. Garcia objects to paragraphs 13-17, 23, 29-31, and 33-36 of the PSR on the basis that these paragraphs contain information obtained from "unidentified cooperating witnesses or

otherwise constitute hearsay."  V. Garcia Objections at 10 (citing PSR ¶¶ 13-17, 23, 29-31, 33-36, at 4-6, 8-15)(internal quotations omitted).  V. Garcia contends that the statements, which constitute hearsay, are not based on fact or any other evidence, and are thus unreliable.  V. Garcia asserts that explaining his relevant conduct does not authorize the USPO to rely upon hearsay that is not reliable.  See V. Garcia Objections at 10 (citing United States v. Mays, 902 F.2d 1501, 1502-03 (10th Cir. 1990)).

V. Garcia specifically objects to paragraph 13 of the PSR, at 4-5, because, he asserts, he never took loans to pay for personal expenses or personal property.  V. Garcia asserts that Blue Dot received the funds from draw downs and used those funds to pay for operating expenses, including rent, salaries, telephones, and "certain general conditions."  V. Garcia Objections at 11. He admits that his salary was paid from those operating expenses, but argues that there was nothing improper about that arrangement.  He also asserts that Blue Dot did not own the Downtown Anasazi, Copper Square, or any other LLC, but that even if it did, there would be nothing unlawful about that arrangement.  See V. Garcia Objections at 11.  V. Garcia further contends that the Copper Square project was one-hundred percent complete when the market collapsed and that he approached First Financial to negotiate a confidential settlement agreement to resolve their disputes to demonstrate that the current value of the building, and thus any losses incurred in the Copper Square project were outside of his control.  See V. Garcia Objections at 11.  V. Garcia also contends that, to the extent funds were drawn to pay for the Lockhaven Estates project, the project was one-hundred percent completed to the extent the loan provided -- V. Garcia asserts that the Lockhaven Estates loan that was fully funded was only intended to cover the beginning of the Lockhaven Estates project, and not to see the development through to

completion.  See V. Garcia Objections at 11-12.  V. Garcia contends that the paragraph 13 is incorrect to state that "'the construction loans were fully funded and subcontractors had not been paid for the majority of their work,'" because the only fully-funded loan was the Lockhaven Estates loan, and that project was one-hundred percent complete within the terms of the loan.  V. Garcia Objections at 12.  V. Garcia contends that the Lockhaven Estate loan funds "were used to pay for the underlying loan to the NM Mortgage Finance Authority, . . . provide all necessary, approved and disclosed infrastructure . . . , and to construct and pay for three homes that are currently on the property."  V. Garcia Objections at 12.  Regarding the Columbian Bank loan for the Downtown Anasazi, V. Garcia asserts that, although the loan was nearly fully funded in August, 2008, he and Columbian Bank were negotiating an increase in the loan "as a contingency and to reimburse a portion of the $4,000,000.00 in interest and fees that the bank had charged to the loan advances."  V. Garcia Objections at 12.  V. Garcia asserts that he and Blue Dot were attempting to negotiate a partial release of condominiums in the Downtown Anasazi in anticipation of finishing the building and condominiums on all condo sales.  See V. Garcia Objections at 12-13.

V. Garcia further objects to the USPO's calculation of the total amount owed to subcontractors based upon the liens filed against the Downtown Anasazi and Blue Dot.  V. Garcia contends that, when Columbian Bank failed, he owed subcontractors $1,550,000.00.  He contends that, when Columbian Bank failed Blue Dot had paid subcontractors for the majority of the work they performed.  He asserts that the USPO used "duplicate amounts from suppliers to subcontractors, incorrect amounts, improper lien filings, and the lien of David Garcia for unrealized gain for the use of his contractor's license."  V. Garcia Objections at 13.  V. Garcia

asserts that some subcontractors were paid in advance, but did not deliver any product, because the subcontractors later went out of business.   V. Garcia asserts that he intended to pay subcontractors and attempted to increase his liquidity so as to finish the projects.   See V. Garcia Objections at 13.

Garcia asserts that he "did not attempt to conceal diversion of funds for the purpose of not paying subcontractors by saying the bank had cut off financing," as the PSR indicates.   V. Garcia Objections at 13.   V. Garcia contends that he was in the process of negotiating a restructured loan with Columbian Bank before the bank closed, and, thus, "the amounts due to subcontractors were not paid because the bank did not restructure the loan, and as a result did not provide funding."   V. Garcia Objections at 14.   V. Garcia further asserts that his failure to pay certain subcontractors did not cause them to file bankruptcy, as he asserts the PSR indicates.   V. Garcia asserts as an example that Mountain Shadows Construction was owed similar amounts from other unrelated construction projects when it filed bankruptcy.   See V. Garcia Objections at 14.

Regarding the Copper Square project, V. Garcia similarly asserts that Blue Dot completed all of the work required by the terms of its loan with First Financial, and thus it is not true that the subcontractors were not paid for a majority of their work.   See V. Garcia Objections at 15.

Regarding paragraph 14 of the PSR, V. Garcia first objects to the statement that his receptionist and bookkeeper facilitated the misuse of company funds.   V. Garcia asserts that his wife received his paycheck and paid their personal bills from their personal account.   V. Garcia also asserts that Blue Dot employed a certified public accountant -- Palmer and Co. -- for

- 43 -

accounting and tax work.  V. Garcia admits that Blue Dot paid salaries to him and to D. Garcia, but V. Garcia contends that Blue Dot disclosed those salary payments to Columbian Bank and Columbian Bank approved that use of the funds.  See V. Garcia Objections at 15.

Regarding paragraph 15 of the PSR, V. Garcia asserts that the earnest money that buyers paid to pre-purchase condominiums in the Downtown Anasazi was not "'spent,'" as the PSR indicates, but rather was deposited into an escrow account with Fidelity National Title.  V. Garcia Objections at 15 (quoting PSR ¶ 15, at 5).  V. Garcia asserts that the pre-sale agreements provided that the buyers forfeited their earnest-money deposits after a certain date.  V. Garcia also asserts that Blue Dot used the deposits only to pay for the development and completion of the Downtown Anasazi, and for commissions for the pre-sales.  See V. Garcia Objections at 16.

V. Garcia objects to the statement in the PSR that "'a significant portion of the loan proceeds were diverted to enable Vincent to purchase the casino,'" because, he alleges, none of the Lockhaven Estates loan funds were used to purchase the J&J Casino.  V. Garcia Objections at 16 (quoting PSR ¶ 15, at 5).  V. Garcia also objects that it is untrue that he had, as the PSR indicates, no interest in completing the Downtown Anasazi.  V. Garcia asserts that, rather than abandoning the project "like thousands of developers did across the country," he invested personal funds in the project and "exhausted virtually all of his liquid assets" -- in addition to attempting to secure alternative financing for the project.  V. Garcia Objections at 16.  Regarding the statement that V. Garcia sent the furniture from Lockhaven Estates to the J&J Casino, V. Garcia asserts that Barnhill informed him the furniture was part of a free-loan program with a local furniture store, intended to be used for demonstrations and to promote the store's sales.  V. Garcia asserts that he did not learn, until after Barnhill left the project, that there was an

outstanding invoice for the furniture.  V. Garcia states that he moved the furniture to the ground floor of the Downtown Anasazi so as to avoid vandalism and theft, and he believes that two pieces were used at the casino, but the rest remained at the Downtown Anasazi.  See V. Garcia Objections at 17.

Regarding paragraph 16 of the PSR, V. Garcia asserts that he did not take the contractor profits in advance; rather, Blue Dot's expenses and profits "were line items in the approved loan and were initially drawn as approved."  V. Garcia Objections at 17.  V. Garcia asserts that Blue Dot's profits, which were portions of draw downs which it took as the contractor, were approved by First Financial.  See V. Garcia Objections at 17.  V. Garcia also objects to the statement that "'once the loan was approved, Mr. Garcia received $450,000.000 directly in his pocket,'" arguing that this did not occur.  V. Garcia Objections at 17 (quoting PSR ¶ 16, at 6).  V. Garcia asserts that payments were made for "legitimate reimbursements" to the contractor, and for other products and services performed on the Copper Square project before the First Financial loan closed.  V. Garcia Objections at 17.  V. Garcia objects to the statement that "'Garcia submitted an invoice to pay utilities after FFCU had already paid for those utilities directly," arguing that First Financial paid a utilities bill for the Copper Square project without informing V. Garcia or the staff at Blue Dot, and, thus, when Blue Dot submitted an invoice for a bill which First Financial had already paid, it was only out of ignorance that the account was paid.  V. Garcia Objections at 18 (quoting PSR ¶ 16, at 6).

Regarding paragraph 17 of the PSR, V. Garcia objects to the statement that "'FFCU could not purchase the building because of the $16 million lien,'" because V. Garcia asserts that any lien which Columbian Bank held on Copper Square should have been released after

- 45 -

Columbian Bank received $1,000,000.00 participation in the loan.  V. Garcia Objections at 18 (quoting PSR ¶ 17, at 6).  V. Garcia also stated that Columbian Bank charged fees and costs each time Blue Dot's loan was rewritten, noting that, when the loan increased from $11,000,000.00 to $16,000,000.00, Columbian Bank "treated it as an entirely new loan" and charged Blue Dot "almost $1,000,000.00" for the rewriting.  V. Garcia Objections at 18.

Regarding paragraph 23 of the PSR, V. Garcia objects to the statement that "'there was no justification of where the money was spent'" from the Lockhaven Estates loan.  V. Garcia Objections at 18 (quoting PSR ¶ 23, at 8).  V. Garcia asserts that the Lockhaven Estates project was completed as outlined in the loan agreement.  V. Garcia asserts that, to the best of his knowledge, all subcontractors who provided labor and material to the Lockhaven Estates project were paid.  V. Garcia contends that Barnhill arranged for Blue Dot to pay for landscaping by referring future Lockhaven Estates buyers to the landscaping company, but V. Garcia asserts that he was not aware of this arrangement.  V. Garcia also objects to the statement that "'[a]ny loan proceeds contributed to any salaries of the corporation were unapproved.'"  V. Garcia Objections at 19 (quoting PSR ¶ 23, at 8).  V. Garcia asserts that the Lockhaven Estates loan agreement provided a "line item for developer's fees and profits," and that he disclosed that some developer's fees and profits would be used to pay for salaries, and that Columbian Bank approved the expense.  V. Garcia Objections at 19.  V. Garcia further asserts that, contrary to paragraph 23of the PSR, he complained "on many occasions" to Columbian Bank and the Columbian Bank's broker regarding Blue Dot's loans, and he assert that he traveled to Overland Park, Kansas for the specific purpose of discussing a rebate on the fees and interests incurred on Blue Dot's loans.  V. Garcia Objections at 19.  V. Garcia also asserts that paragraphs 23 of the

PSR falsely states that V. Garcia did not discuss acquiring additional funding with Columbian Bank; V. Garcia contends that he discussed an additional $2,000,000.00 in funding for the Downtown Anasazi with a Columbian Bank branch in Texas.  See V. Garcia Objections at 19.

V. Garcia objects to the statement in paragraph 29 of the PSR that he "'utilized the funds for personal gain'" which were acquired to finance the construction projects.  V. Garcia Objections at 19 (quoting PSR ¶ 29, at 10).  V. Garcia asserts that he did not use the construction financing for personal gain, and points out that he pled guilty to using loan funds to purchase a casino, "with the intent to generate revenue for the project."  V. Garcia Objections at 19.

V. Garcia objects to the subcontractors' liens that the USPO reports at paragraph 30 of the PSR.  V. Garcia contends that these lien amounts are inaccurate, as some of the liens "do not apply directly to the property, or are incorrect."  V. Garcia Objections at 20.  V. Garcia further argues that some of the liens are for work which was scheduled, but which never commenced. He also asserts that some of the liens are from the subcontractor's underlying suppliers, and are, thus, duplicative of the subcontractors' liens.  V. Garcia asserts that the "true total is closer to $1,550,000.00" that he owes to subcontractors.  V. Garcia Objections at 20.

V. Garcia also objects to the USPO's statement that he "'would access funds by submitting draw down requests to the bank,'" as V. Garcia asserts that he never accessed funds by submitting draw downs to Columbian Bank, and that any draw downs Barnhill requested were on behalf of Lockhaven Estates, not on V. Garcia's behalf.  V. Garcia Objections at 20 (quoting PSR ¶ 31, at 13).  V. Garcia also objects to the statement that "'no Lockhaven money went out of the office without Vincent Garcia's knowledge.'"  V. Garcia Objections at 20 (quoting PSR ¶ 31, at 13).  V. Garcia contends that Barnhill "accessed funds using the LLC's

- 47 -

ATM card," and that he was not aware of withdrawals he did not authorize.  V. Garcia Objections at 20.

Regarding paragraph 33 of the PSR, V. Garcia objects to the statement that he was aware of Barnhill's falsification of invoices purportedly from Statewide Homes and Qwest Communications.  V. Garcia asserts that he "did not review nor sign this draw down request," and that he has "become aware only after reading the PSR, of certain activities of Mr. Barnhill." V. Garcia Objections at 20.  V. Garcia asserts that he never instructed Barnhill to falsify invoices and that he instructed Barnhill only to "get draws on the loan."  V. Garcia Objections at 20.

V. Garcia objects to the statement in paragraphs 34 of the PSR that he was aware that Barnhill submitted false invoices ostensibly from Statewide Homes and Cox Communications to support draw-down requests.  V. Garcia contends that he did not review or sign any draw-down request based upon these false invoices.  V. Garcia similarly asserts that he was unaware of these transactions until after he read the PSR.  See V. Garcia Objections at 21.

V. Garcia objects to the statement in paragraph 35 of the PSR that "'Barnhill was instructed to use an old sheetrock bid . . . in order to get the money.'"  V. Garcia Objections at 21 (quoting PSR ¶ 35, at 14).  V. Garcia contends that using an old sheetrock bid from the DevCorp project was entirely Barnhill's idea, as Barnhill "dealt with Devcorp on a prior project and had access to the file and logos he used to create the invoice."  V. Garcia Objections at 21.

V. Garcia objects to the statement in paragraph 36 of the PSR that he transferred funds from New Mexico Bank and Trust to a Compass Bank in Washington so as to "'hide the nature and source of the funds.'"  V. Garcia Objections at 21 (quoting PSR ¶ 36, at 15).  V. Garcia asserts that the "transaction was fully documented as to the source of funds to the Washington

State Gaming commission" and that the gaming commission was aware that the funds originated from a construction loan.  V. Garcia Objections at 21-22.

V. Garcia also objects to certain conduct included as part of his relevant conduct.  V. Garcia contends that "[n]one of the conduct underlying the other counts in the superseding indictment occurred during the commission of the offense in Count 3" and thus does not constitute his relevant conduct.  V. Garcia Objections at 22.  V. Garcia points out that the Plea Agreement dismisses all counts against him except for count three.  V. Garcia asserts that the conduct underlying count three was done for a different purpose and on a different date than all other conduct underlying the other counts in the Indictment.  V. Garcia asserts that to hold him accountable for the conduct of others' crimes of which he was not convicted "would render the plea negotiation process ineffectual."  V. Garcia Objections at 23 (citing Blakely v. Washington, 542 U.S. 296, 301-02 (2004)).

### 5.    The Addendum to the PSR.

On August, 14, 2012, the USPO released an Addendum to the Presentence Report.  See Addenedum to the Presentence Report, dated Aug. 14, 2012 ("Addendum").  Regarding the United States' objection that the gross loss amount should be the amount to which the parties stipulated in the Plea Agreement -- $842,237.44 -- and not $23,550,835.69, as the USPO calculates the amount, the USPO states that it calculated the gross loss amount pursuant to U.S.S.G. § 6B1.2 (a), which states that "a plea agreement that includes the dismissal of a charge . . . shall not preclude the conduct underlying such charge from being considered under the provisions of § 1B1.3 (Relevant Conduct) in connection with the count(s) of which the defendant is convicted."  Addendum at 1; U.S.S.G. § 6B1.2(a).  The USPO notes that the United States'

objections regarding the determination and application of credits against the gross loss amount may require an evidentiary hearing to be resolved, and further notes that the net loss amount cannot be addressed until after the Court determines the value of V. Garcia's credits and the methodology to be used for applying his credits against the gross loss amount. See Addendum at 1.

Turning to V. Garcia's objections, regarding V. Garcia's objection to the United States' proposed method of applying V. Garcia's credits to the gross loss amount on a pro rata basis, the USPO states that it correctly calculated the net loss amount in the PSR, pursuant to U.S.S.G. § 2B1.1, noting that documentation was provided for the fair market value of all of V. Garcia's pledged collateral. Regarding V. Garcia's objection to the statement in paragraph 13 of the PSR that V. Garcia used loan funds to pay for personal living expenses or personal property, the USPO states that it obtained the information in paragraph 13 from investigative reports that are discovery material in this case, and properly included that information in the PSR as part of V. Garcia's relevant conduct. See Addendum at 2. The USPO makes the same statement in response to V. Garcia's objections to the information in paragraphs 15, 16, 17, 23, 29-31, and 33-36 of the PSR. See Addendum at 3-5.

The USPO responds to V. Garcia's objection to the classification of First Financial as a "victim," by representing that the USPO spoke with Heyward, "who advised due to a signed disclosure agreement executed between Mr. Garcia and the financial institution, regarding an insurance pay-out, he was not at liberty to provide a victim impact statement." Addendum at 5. The USPO states, thus, that "it may be necessary to conduct an evidentiary hearing . . . to determine whether First Financial Credit Union is a 'victim.'" Addendum at 5. Regarding V.

Garcia's objections to the inclusion of other lending instructions as victims, in paragraphs 55-56 of the PSR, the USPO states that the lending institutions listed in paragraphs 55-56 should be considered victims, because they "sustained a loss based on 'Reasonably Foreseeable Pecuniary Harm,'" as defined under U.S.S.G. § 2B1.1, cmt. n.3(iv).  Addendum at 5.  The USPO notes that V. Garcia objects to the inclusion of lending institutions as victims because of the general economic downturn which occurred concurrently with his criminal activity, but the USPO states that, nonetheless, V. Garcia "knew or, under the circumstances, reasonably should have known, his actions in misappropriating loan funds . . . would result in pecuniary harm."  Addendum at 5. The USPO also contends that the subcontractors listed in paragraph 61 of the PSR are victims, contrary to V. Garcia's objection, because V. Garcia should have known that the $365,677.00 which he fraudulently procured and did not use to pay subcontractors "was no longer available for the purpose of paying subcontractors, resulting in a loss to these contractors."  Addendum at 6.

The USPO also contends that it properly applied a 3-level enhancement for V. Garcia's use of sophisticated means to commit bank fraud in paragraph 62 of the PSR.  The USPO asserts that, although V. Garcia objects to the enhancement, because he was not aware of Barnhill's specific actions in procuring the $365,677.00 and that transaction was not especially complex, "[t]he sophisticated means enhancement is not based solely on the conduct surrounding the $365,677 fraudulent draw request."  Addendum at 6.  The USPO notes that V. Garcia told Barnhill to generate false invoices to support the draw-down request for $365,677.00, and that V. Garcia transferred the draw down funds from the Downtown Anasazi account to a separate bank account with Compass Bank, held under a different name, and V. Garcia then used the second

bank account to write a check for the purchase of J&J Casino.  The USPO contends that these actions demonstrate the use of sophisticated means to "obtain, conceal, and transfer assets as part of the criminal conduct," and thus the USPO properly applied the 3-level enhancement. Addendum at 6-7.

Regarding V. Garcia's objection to the gross loss amount being beyond that to which the parties stipulated in the Plea Agreement, which the USPO includes in paragraph 122, the USPO states that it properly calculated the gross loss amount in the PSR, pursuant to U.S.S.G. § 1B1.3, for all of V. Garcia's conduct between December, 2006, and May, 2008.  See Addendum at 7.

The USPO contends that it properly determined that V. Garcia is not eligible for a downward departure for aberrant behavior, pursuant to U.S.S.G. § 5K2.20.  The USPO points out that V. Garcia's offense level was calculated upon the basis of his relevant conduct, which included criminal activity beyond the offense to which V. Garcia pled, and indicates that V. Garcia "participated in several criminal acts . . . between December 2006 and May 2008." Addendum at 8-9.  The USPO asserts that, because V. Garcia's relevant conduct throughout that period included submitting forged vendor invoices and transferring funds from one account to another, similar to his federal offense, the bank fraud to which V. Garcia pled cannot accurately be described as aberrant behavior.  See Addendum at 9.

8.      **The August 25, 2012 Hearing.**

The Court held an evidentiary hearing on August 25, 2012.  The Court made a few initial comments regarding the PSR.  First, the Court noted that paragraph 23, at 9, should read "nothing could be done from the bank's point of view," rather than as written, "nothing could be done from the banks point of view."  Tr. at 3:13-19 (Court).  The parties agreed.  See Tr. at 3:25-

4:1 (Bowles).  The Court also noted that paragraph 25, at 9, of the PSR, indicates that Canon Air Force Base in Clovis closed, but the Court stated that the Canon Base had not closed, and, rather that the operations at Canon changed.  See Tr. at 4:2-6 (Court).  V. Garcia stated that he understood a closure was threatened at Canon, and the Court suggested that the PSR be amended to indicate that a closure was threatened and the operations changed at Canon Air Force Base, and the parties agreed with this amendment.  See Tr. at 4:13-22 (Bowles, Court, Gerson).

The United States began with its objection to the USPO's calculation of the gross loss amount.  The United States stated that V. Garcia is convicted of bank fraud arising from a draw-down request that incorporated a false invoice, but that the United States is not contending and does not believe that the underlying loan on which the draw-down request was submitted was fraudulent.  See Tr. at 6:18-7:7 (Court, Gerson).  The United States asserted that V. Garcia's use of the draw down to purchase a casino rather than to pay for the work represented on the invoices demonstrates V. Garcia's fraudulent intent.  See Tr. at 7:8-24 (Court, Gerson).  The United States stated that it views V. Garcia's submission of false invoices for other draw-down requests as his relevant conduct, and that the stipulated gross loss amount was "the total of the draw down requests incorporating false line items or themselves simply constituting false draw down requests."  Tr. at 7:25-8:13 (Gerson).  The United States stated that it listed the value of the fraudulent invoices in its U.S. Objections, and that the total sum from those fraudulent invoices supporting the draw downs is $842,237.44, the stipulated gross loss amount.  See Tr. at 8:10-22 (Gerson, Court).  The United States asserted that some of the invoices listed in counts one, two, and four through seven were for legitimate services performed, and thus the total value of the invoices could not be added together for the gross loss amount.  See Tr. at 8:23-9:10 (Court,

Gerson).  The United States stated that it based its calculations on the facts recited in Barnhill's Plea Agreement, filed Dec. 16, 2010 (Doc. 47), which the parties agreed to admit into evidence for the hearing as Exhibit 4.  See Tr. at 10:1-11:13 (Court, Gerson, Bowles).

The United States Probation Officer for the case, David Wayne Mills then addressed the Court.  See Tr. at 1:25-2:1; id. at 11:17-18 (Court).  Mills stated that the USPO calculated the gross loss amount from not only the stipulated gross loss amount, but the total pecuniary harm that V. Garcia caused to Columbian Bank and First Financial.  See Tr. at 11:19-20:5 (Mills). Mills stated that, "had he not submitted fraudulent documentation on these draw down requests we believe that this money would have been returned back to the bank or forwarded on to the contractors on which it was drawn for."  Tr. at 12:6-10 (Mills).  The United States contended that the USPO's calculation does not "fit within what we came into this case believing the course of conduct to be."  Tr. at 12:13-15 (Gerson).  The United States asserted that it could not prove causation for all of the pecuniary harm that the USPO includes in its calculation: "I don't think we can show that there were defaults o[n] the loans [] because of these false draw down requests."  Tr. at 12:16-18 (Gerson).  The United States asserted that it would have included the defaults on V. Garcia's loan, as the USPO does, if the United States had charged V. Garcia with false loan application, but, because V. Garcia was not charged with a false loan application, the pecuniary harm caused by his defaults should not be included in the gross loss amount.  See Tr. at 12:22-13:4 (Gerson).  The United States informed the Court that the first seven counts of the Indictment allege bank fraud arising from the use of false invoices, counts eight through twelve allege money laundering charges, and counts nine through twelve allege that V. Garcia laundered money instruments.  See Tr. at 13:13-17 (Gerson).  The United States noted that it has moved to

dismiss all of the money-laundering counts and the remaining bank fraud counts upon sentencing, which benefits V. Garcia in sentencing because the money-laundering counts would have increased his base offense level.  See Tr. at 13:18-23 (Gerson).

V. Garcia stated that he agrees with the United States' position regarding the gross loss amount.  See Tr. at 14:7-8 (Bowles).  V. Garcia asserted that the common plan or scheme constituting his relevant conduct is seen in the allegations contained in counts one through seven, not the remaining criminal activity alleged in the Indictment.  See Tr. at 14:9-15 (Bowles).  V. Garcia asserted that his relevant conduct does not include all of the losses that the USPO included in the PSR.  See Tr. at 14:19-21 (Bowles).  The Court noted that the USPO used a definition of actual loss that included all "reasonabl[y] foreseeable pecuniary harm that resulted from the offense" and inquired whether V. Garcia agrees with the Court that that definition is "fairly broad," and V. Garcia stated that he agrees the definition is broad.  Tr. at 14:22-15:1 (Court).  The Court inquired what V. Garcia's position is regarding the USPO's inclusion of "actual loss and intended loss" in its calculation.  Tr. at 15:9-10 (Court)(citing PSR ¶ 60, at 22).  V. Garcia stated that he does not agree with the USPO's calculation, because national economic downturn caused much of the harm that Columbian Bank and First Financial suffered.  See Tr. at 15:12-19 (Bowles).  The Court agreed that V. Garcia cannot be attributed with Columbian Bank's failure, or First Financial's -- had it failed as well -- but inquired why the value of the loans on which V. Garcia defaulted could not be included in the gross loss amount.  See Tr. at 15:20-16:1 (Court).  V. Garcia asserted that he is not charged with a false loan acquisition and that defaulting on his loans was not part of his relevant conduct.  See Tr. at 16:2-7 (Bowles).  V. Garcia asserted that he was legitimately attempting to build several buildings, and that the USPO

ignores the contribution of many market factors to the economic harm First Financial and Columbian Bank suffered.  See Tr. at 16:8-20 (Bowles).  V. Garcia asserted that the USPO's approach would make anybody liable for the entire value of a loan even if only $25.00 of it was fraudulently drawn-down.  See Tr. at 17:5-14 (Bowles).  The Court countered that the USPO appears to be stating that "as a result of Mr. Garcia['s] conduct he ultimately defaulted on both loans."  Tr. at 17:15-18 (Court).  The Court pointed out that the USPO concludes that V. Garcia "'knew or should have known his conduct would [have] caused $2[,520,302.61] in [monetary harm]'" from the liens filed against V. Garcia's properties.  Tr. at 17:20-23 (Court)(quoting PSR ¶ 60, at 22).  The Court stated that the USPO appears to be looking at V. Garcia's willful failure to pay subcontractors.  See Tr. at 17:24-18:1 (Court).  V. Garcia responded that the USPO's allegation lacks factual support.  See Tr. at 18:2-3 (Bowles).  V. Garcia asserted that he "intended to pay the contractors," but when he went to Columbian Bank the last time, the bank had already failed.  Tr. at 18:5-10 (Bowles).  V. Garcia further argued that he did not cause Columbian Bank's failure, which caused V. Garcia to be unable to pay the subcontractors.  See Tr. at 18:11-16 (Bowles).  V. Garcia further argued that he "take[s] issue with the sentence as a result of Mr. Garcia's conduct he ultimately defaulted on both loans."  Tr. at 18:17-19 (Bowles). V. Garcia contended that his loans defaulted, because Columbian Bank failed, a failure that was unrelated to V. Garcia's actions.  See Tr. at 18:22-19:2 (Bowles).

The Court inquired whether it correctly understood V. Garcia's objections to be: (i) a legal objection that the USPO considers conduct that it should not as part of V. Garcia's relevant conduct -- specifically V. Garcia's failure to pay subcontractors -- and that only the conduct underlying counts one through seven constitute V. Garcia's relevant conduct; (ii) a factual

objection that V. Garcia's conduct did not cause his default on both of the loans; and (iii) that V. Garcia's failure to pay subcontractors did not cause the losses alleged in the PSR.  See Tr. at 19:14-22 (Court).  V. Garcia stated that the Court's understanding is correct and reiterated that he agrees with the United States' calculation of the gross loss amount.  See Tr. at 19:23-20:6 (Bowles).

Mills then stated that, although the USPO noted the stipulated gross loss amount, under U.S.S.G. § 6B1.2, the stipulation to an amount in the Plea Agreement does not preclude the USPO from "considering the conduct that was involved in the other counts 1 through 19."  Tr. at 20:19-21:5 (Mills).  Mills stated that, regarding Columbian Bank and First Financial's inclusion as victims, the USPO included the financial harm to those institutions as part of its gross loss amount, "because of the foresee[able] pecuniary harm that was caused to them, . . . based upon Mr. Garcia's mis[appropriation] of the construction funds which were supposed to go to these contractors."  Tr. at 22:1-6 (Probation Officer).  The Court inquired of Mills he believes that V. Garcia would not have defaulted had he not used the fraudulent invoices to draw down on his loans, or whether the possibility is "rather speculative" based upon the record before the Court, and Mills stated that he is not sure.  Tr. at 23:5-14 (Court, Mills).  V. Garcia asserted that causation is an issue with the losses the USPO has included in the PSR.  See Tr. at 24:11-17 (Bowles).  V. Garcia asserted that the federal sentencing guidelines handbook indicates that reasonably foreseeable pecuniary harm is that for which his criminal activity was the but-for cause.  See Tr. at 24:11-25:5 (Bowles).  V. Garcia asserted that the United States included in the stipulated gross loss amount all the losses of which the United States believes it could prove V. Garcia's actions were the but-for cause.  See Tr. at 25:5-8 (Bowles).  V. Garcia argued that any

losses beyond that to which the parties stipulated are troubled by too much speculation and other market factors for the United States to prove that V. Garcia's conduct was their but-for cause. See Tr. at 25:9-15 (Bowles).  V. Garcia asserted that he could not have known or reasonably foreseen that the losses the USPO included in the PSR would occur, given that the losses occurred concurrent to substantial market turmoil.  See Tr. at 25:16-22 (Bowles).

The Court stated that it is not certain how to define V. Garcia's relevant conduct, and was unsure whether V. Garcia's relevant conduct should be limited to the common scheme involving fraudulent invoices on which the parties agree.  See Tr. at 26:5-8 (Court).  The United States asserted that the Court may consider the harm that subcontractors suffered part of V. Garcia's relevant conduct for the purposes of any sentencing guideline that does not involve a loss calculation.  See Tr. at 26:14-27:1 (Gerson).  The United States stated that it agrees with V. Garcia that the subcontractors' harm does not factor into V. Garcia's base offense level.  See Tr. at 27:12-16 (Gerson).  The United States informed the Court that it is not in a position to prove that V. Garcia's fraudulent draw-down requests proximately caused more losses beyond those constituting the stipulated gross loss amount.  See Tr. at 28:1-5 (Gerson).  The United States asserted that V. Garcia's default on his loans "is something [that] can be attributed to Mr. Garcia in the cosmic sense, in the sense of he's the person who's ultimately responsible for not having paid his loans back," but that "cosmic sense" does not determine his relevant conduct for the purposes of his criminal case.  Tr. at 28:16-29:3 (Gerson).

V. Garcia noted that, for the purposes of V. Garcia's relevant conduct, his offense was submitting false invoices for draw-down requests and "nothing more than that."  Tr. at 29:6-21

(Bowles).  V. Garcia asserted that to attribute any losses to him beyond the stipulated gross loss amount "doesn't fit within the legal bases for computing a sentence."  Tr. at 29:18-22 (Bowles).

The Court then turned to the determination of V. Garcia's credits.  The Court noted that, on page 5 of the V. Garcia Objections, V. Garcia includes a chart that indicates that the United States and V. Garcia agree on the value of V. Garcia's credits.  See Tr. at 29:24-30:4 (Court). The Court stated that it understood that V. Garcia and the United States disagreed on the value of V. Garcia's credits, and V. Garcia stated that the Court's understanding is correct.  See Tr. at 30:4-7 (Court, Bowles).  V. Garcia stated that the United States disputes: (i) the value of Lockhaven Estates, which the USPO and V. Garcia believe is $1,600,000.00; (ii) whether the value of V. Garcia's home may be applied as a credit; and (iii) the value of Lockhaven Estates, which the USPO and V. Garcia assert is $800,000.00.  See Tr. at 30:7-14 (Bowles).  The Court noted that the FDIC is before it regarding the foreclosure of V. Garcia's home, and inquired whether the appraisal value or the value as determined by the foreclosure proceeding would be more useful to the parties.  See Tr. at 30:15-21 (Court).  V. Garcia stated that he is unsure which valuation would be more beneficial to him, but noted that the guidelines state that the Court should use the appraisal value at the time of sentencing.  See Tr. at 30:22-31:3 (Bowles); id. at 31:14 (Bowles).  V. Garcia's counsel, Jason Bowles, stated that he would like to confer with V. Garcia regarding whether an appraisal or the value of Lockhaven Estates as determined by foreclosure would be preferable to him.  See Tr. at 31:18-21.  V. Garcia stated, nonetheless, that his argument regarding credits is that they should not be divided pro rata, as the United States proposes.  See Tr. at 31:21-32:1 (Bowles).

After the parties presented witness testimony, the United States requested the Court to disregard the valuations on of V. Garcia's credits on page 23 of the PSR and, rather, to determine the value of the credits from the testimony presented at the hearing.  <u>See</u> Tr. at 100:11-21 (Gerson).  The United States asserted that V. Garcia should not receive a credit for the value of his personal residence, because the FDIC testified that neither it nor Columbian Bank received any benefit from the sale of V. Garcia's personal residence.  <u>See</u> Tr. at 101:9-14 (Gerson).  The United States also asserted that V. Garcia should not receive a credit for the value of his personal property and assets, listed on page 23 of the PSR, with an estimated total value of $500,000.00, because the FDIC did not receive any funds from those items.  <u>See</u> Tr. at 101:15-21 (Gerson).

The United States admitted that the value of the unsold properties -- Lockhaven Estates and Copper Square -- was uncertain, but asserted that the sentencing guidelines direct the Court "that if an item of collateral is not yet actually sold by the time of sentencing [the] Court should make use of appraised value," and that the Court has sufficient evidence of the appraised values of those properties from the witnesses' testimony.  Tr. at 100:22-101:4 (Gerson).  The United States asserted that the Court should adopt an estimated value somewhere within the range of appraisals given for the Lockhaven Estates and Copper Square properties.  <u>See</u> Tr. at 101:22-102:2 (Gerson).  The United States noted that the FDIC's losses on the Downtown Anasazi are known, because the FDIC sold the note, and thus the Court need only make a determination regarding the value of Lockhaven Estates and Copper Square.  <u>See</u> Tr. at 102:18-25 (Gerson).

V. Garcia asserted that he made a payment of $4,200,000.00 to First Financial on February 20th, 2008, which is not reflected in the USPOS' calculation of his credits in the PSR.  <u>See</u> Tr. at 103:4-12 (Bowles).  Mills responded that the USPO could not verify the amount of

that payment, because First Financial's Chief Executive Officer, Ben Heyward would not discuss payments made before the settlement agreement.  See Tr. at 103:15-25 (Mills).  V. Garcia asserted that the $4,200,000.00 should be applied to the $2,900,000.00 in credits which the USPO calculates in the PSR.  See Tr. at 104:16-18 (Court, Bowles).  The United States asserted that the USPO did include the $4,000,000.00 which was paid to Columbian Bank on the closing of the Copper Square loan in its credits calculation.  See Tr. at 131:6-17 (Gerson)(citing PSR ¶ 16, at 6).  Garcia agreed with the United States that the Court should estimate the value of Lockhaven Estates and Copper Square, and that V. Garcia should receive a $555,000.00 credit for the sale of the Downtown Anasazi note.  See Tr. at 104:19-25 (Bowles).  V. Garcia conceded that no creditor received any value from the sale of his personal residence.  See Tr. at 104:25-105:1 (Bowles)("[I]t doesn't sound like they received anything on the house.").

V. Garcia also asserted that the parties do not dispute the value of his personal property and assets that support the personal guarantee he provided Columbian Bank, and that the value of those items should be added to his credit.  See Tr. at 105:2-9 (Bowles).  The Court questioned V. Garcia regarding the value of his personal property and assets, because he has not provided any evidentiary documentation of those values to the Court.  See Tr. at 105:10-12 (Court).  The United States pointed out that it does not accept the value of those items as reported in the PSR and that it objects to that value being applied towards V. Garcia's credits.  See Tr. at 105:15-20 (Gerson).  V. Garcia asserted that, even if a creditor has not received his personal property and assets yet, "the point is under the guarantee that was pledged collateral and the guidelines . . . what was pledged as against the loan . . . . could have been seized" under the sentencing guidelines.  Tr. at 106:1-7 (Bowles).

V. Garcia asserted that the Court should use the most recent appraisal from Copper Square in determining its value.  <u>See</u> Tr. at 132:4-11 (Bowles).  V. Garcia affirmed that he believes the Court should estimate the value of Lockhaven Estates as between the two appraisals. <u>See</u> Tr. at 132:12-14 (Bowles).

Mills informed the Court that the USPO did not include the $550,000.00 from the sale of the Downtown Anasazi mortgage note in V. Garcia's credits, because it applied that amount to reduce the outstanding balance of V. Garcia's Downtown Anasazi loan.  <u>See</u> Tr. at 133:1-4 (Mills).  Mills stated that V. Garcia should receive a credit only for any proceeds from the sale of his personal residence that the FDIC actually receives.  <u>See</u> Tr. at 133:5-17 (Mills).  Mills stated that the USPO cannot confirm the value of V. Garcia's reported personal property and assets, although he did visit V. Garcia's home and viewed some of the property listed in the PSR.  <u>See</u> Tr. at 133:17-25 (Mills).  Specifically, Mills viewed V. Garcia's artwork, vehicles, pottery and knife set.  <u>See</u> Tr. at 134:1-6 (Court, Mills).  Mills pointed out that he noted in the PSR where V. Garcia provided an estimate of the value of his personal property, and that he used an average approximate value of the items for which V. Garcia could not verify their value.  <u>See</u> Tr. at 134:7-19 (Mills)(citing PSR ¶¶ 89-94, at 36).  Mills stated that he believed the Court should use the most recent appraisal values from Copper Square and Lockhaven Estates, which may not be reflected in the PSR.  <u>See</u> Tr. at 134:20-135:17 (Court, Mills).

The United States, in closing about the determination of V. Garcia's credits, asserted that V. Garcia should not receive any credit for the value of his personal residence, because the FDIC received no value from its sale.  <u>See</u> Tr. at 135:25-136:5 (Gerson).  The United States stated that, because Columbia had the second lien from a second mortgage on V. Garcia's personal

residence, and only the first mortgage on V. Garcia's personal residence was satisfied by the residence's sale for $551,000.00, the FDIC could obtain no value from the sale as Columbian Bank's receiver.  See Tr. at 136:3-11 (Gerson).  V. Garcia asserted that the Court should use the evidence before it regarding Lockhaven Estate's value, rather than waiting to see what the FDIC may obtain through Lockhaven Estate's foreclosure.  See Tr. at 136:12-23 (Court, Bowles).  The United States agreed that V. Garcia's sentencing should not be delayed in anticipation of determining the FDIC's value obtained through Lockhaven Estate's foreclosure.  See Tr. at 137:1-7 (Gerson).  The United States asserted, regarding V. Garcia's personal property and assets, that V. Garcia has not "satisfied his burden of proof even by approximat[ion] to establish any value for those items," and, thus, requested that the Court not credit V. Garcia with the value he presented for any of those items.  Tr. at 137:16-20 (Gerson).  The Court inquired why V. Garcia is not competent to offer a market value of his property and assets, and the United States stated that it is not arguing that V. Garcia is not competent, but rather that the Court should not apply any credits for the values V. Garcia has provided.  See Tr. at 137:21-138:12 (Court, Gerson).  The United States asserted that nobody will "take advantage of those items at this point" and that, thus, there is no basis for the value of those items to be applied as a credit for V. Garcia.  Tr. at 138:13-16 (Gerson).  V. Garcia countered that he is competent to provide an opinion on the value of his personal property and assets, and that the successor in the Downtown Anasazi mortgage note can still levy on the collateral, and thus he should receive a credit for the value of his personal property and assets pledged as collateral.  See Tr. at 139:6-13 (Bowles).  V. Garcia asserted that giving him a credit for the value of his personal property and assets is appropriate under the sentencing guidelines, although he admitted he should not receive a credit

for the value of his personal residence, because Columbian Bank's lien thereon was extinguished by its sale.  See Tr. at 139:20-140:4 (Bowles, Court).

The United States then argued regarding the application of V. Garcia's credits against the gross loss amount.  The United States asserted that there is no basis for the USPO to apply the total amount of credits from V. Garcia's bank loans "dollar [f]or dollar" against the stipulated gross loss amount, which only covered his fraudulent draw downs.  Tr. at 141:1-7 (Gerson).  The United States argued that only "[t]he credits for collateral should [be] applied against what they were collateral for."  Tr. at 141:8-10 (Gerson).  The United States suggested that V. Garcia's credits should be prorated, based upon the proportion of the fraudulent draw downs as compared with his overall bank loans, because his collateral was pledged for the entire value of his bank loans, and not just for the fraudulent draw downs.  See Tr. at 141:8-21 (Gerson).  The United States contended that U.S.S.G.. § 2B1.1, cmt. n.3(E)(ii), when referring to a credit applied for collateral pledged, is "written . . . from the point of view of collateral pledged against an under[]taking that resulted in a criminal loss."  Tr. at 142:18-21 (Gerson).  The United States asserted that the collateral that is listed in the PSR was pledged against bank loans, and, thus, "it's not a fair use of this application note to say that all of these credits should be applied on a dollar [f]or dollar basis against a fraction of the bank loans."  Tr. at 142:22-143:1 (Gerson).  The United States asserted that the Court should "prorate the credits between the part of the losses that are criminal and the part of the bank's losses that are not part of the criminal case."  Tr. at 143:13-16 (Gerson).

The Court inquired of the United States why V. Garcia's bank loans are not irrelevant for the purposes of U.S.S.G. § 2B1.1, cmt. n.3(E)(ii), given that the application note discusses only

collateral which was pledged by a defendant and not the purposes for which the collateral was pledged.  See Tr. at 144:10-20 (Court).  The United States asserted that it derives its proposed methodology from the term "collateral pledged" in the application note.  Tr. at 144:21-25 (Gerson).  The Court responded that the application note does not distinguish between collateral pledged against a loan and other collateral pledged, and suggested that the sentencing guideline is, thus, not concerned with any loan for which the collateral was pledged.  See Tr. at 145:8-15 (Court, Gerson).  The United States disagreed and asserted that the sentencing guidelines are concerned with "fashioning[] an[] appropriate punishment for criminal conduct," and that V. Garcia's criminal conduct was the fraudulent draw-down requests and the collateral pledged was not pledged for the draw-down requests specifically but for his loans generally.  Tr. at 145:16-21 (Gerson).  The United States asserted that, within the context of the rest of the application note, "collateral pledged" is not used generally.  Tr. at 145:21-25 (Gerson).  The United States asserted that collateral pledged in an entirely unrelated economic transaction would not be applied as a credit under the guideline, and, therefore, neither should the entire value of V. Garcia's collateral be used to swallow his criminal conduct.  See Tr. at 146:1-12 (Gerson).  The United States asserted that to allow V. Garcia to walk away from his criminal conduct with no net losses would be unjust.  See Tr. at 146:13-17 (Gerson).

The United States asserted that U.S.S.G. § 2B1.1, cmt. n.3(E)(ii)'s discussion of the "amount the victim has recovered" should be applied in the "context of the amount of criminal conduct relative to the overall amount of loan activity" here.  Tr. at 147:1-14 (Gerson).  The Court inquired where, in the sentencing guideline, the United States finds support for its proposition that the "Court . . . prorate the [] recovery as between fraudulent drawdowns and the

total loan amounts."  Tr. at 148:10-14 (Gerson).  The United States asserted that the general
structure of the guideline supports that proposition, and asserted that the "use of the words 'the
victim has recovered' and the words 'collateral pledged' because those have to be tied to the
criminal conduct."  Tr. at 148:17-22 (Gerson)(quoting U.S.S.G. § 2B1.1., cmt. n.3(E)(ii)).  The
United States asserted that it would be an

> unfair windfall to a defendant in the kind of fact pattern that we have in this case
> to say that the loss amount caused by his criminal conduct would be clea[r]ly
> wiped out by the collateral pledged against a large loan or a series of large loans
> where the amount of the conduct is small.

Tr. at 149:1-7 (Gerson).  The Court inquired how such a situation would be a windfall for V.
Garcia, given that the parties stipulated to a gross loss amount that did not include the totality of
the financial institutions' losses in the matter.  See Tr. at 149:8-23 (Court, Gerson).  The Court
stated that it does not seem to make sense to disregard the losses on V. Garcia's loans for the
gross loss amount, but then to allow those amounts to factor into his sentencing.  See Tr. at
149:25-150:3 (Court).  The Court pointed out that U.S.S.G. § 2B1.1, cmt. n.3(E)(ii) refers to
collateral pledged against losses and does not mention reducing the amount pledged in relation to
the loans for which it was pledged.  See Tr. at 150:12-20 (Court, Gerson).  The United States
responded that the collateral V. Garcia pledged was not pledged against the losses.  See Tr. at
150:21-23 (Gerson).  The United States contended that there "has to be some translation between
the collateral [] pledged in the [] norm[al sense]" and credits "in the context of  criminal loss that
is much smaller than the total loan amount."  Tr. at 151:3-6 (Gerson).

     V. Garcia asserted that the Plea Agreement and the sentencing guidelines inform the
Court's calculation of credits against losses for V. Garcia.  See Tr. at 151:11-15 (Bowles).  V.
Garcia pointed out that, in paragraph 10(b)-(c) of the Plea Agreement, at page 6, the parties

stipulated to a gross loss amount, and that U.S.S.G. § 2B1.1, cmt. n.3(E)(i) and (ii) should be used to determine the net losses. See Tr. at 152:1-7 (Bowles). The Court pointed out that the application note provides that it applies to "loss" under U.S.S.G. § 2B1.1(b)(1), and that the application note does not distinguish between actual loss and intended loss. Tr. at 152:17-22 (Bowles)(citing U.S.S.G. § 2B1.1, cmt. n.3). The Court also noted that it was unsure how the cases would differ where U.S.S.G. § 2B1.1, cmt. n.3(E)(i) would apply as opposed to U.S.S.G. § 2B1.1, cmt. n.3(E)(ii). See Tr. at 153:12-14 (Court). V. Garcia asserted that cmt. n.3(E)(i) refers to the fair market value of property returned or services rendered, and contended that that application note does not state anywhere that the money should be prorated against the loan. See Tr. at 153:15-18 (Bowles). V. Garcia asserted that he has found no case law or guideline language which indicates that the Court should prorate his collateral pledged against the total loan amounts. See Tr. at 154:4-11 (Bowles). V. Garcia contended that, when reading all of the guidelines together, one can discern that Congress was attempting to punish defendants differently depending upon whether victims received more value through credits than they lost. See Tr. at 154:12-20 (Gerson). V. Garcia asserted that Congress never intended for a court to evaluate a defendant's credits based upon the loans for which collateral was pledged, but rather intended for credits to be applied against losses, as the guidelines define losses. See Tr. at 156:13-23 (Bowles).

Mills stated that he agrees with V. Garcia's understanding of the guidelines in this case. See Tr. at 157:25-158:2 (Mills). Mills further stated that he disagrees that the total value of V. Garcia's credits should be applied against the stipulated gross loss amount and asserted that V.

Garcia's credits should be applied against the total losses, as listed in the PSR at approximately $23,000,000.00. See Tr. at 158:2-159:1 (Mills).

The Court inquired whether V. Garcia believes the credits and losses should be determined respective to each victim, rather than as a lump sum. See Tr. at 159:14-18 (Court). V. Garcia stated that he does. See Tr. at 159:19-22 (Bowles). V. Garcia stated that he agrees with the United States' chart on pages 3-4 of the U.S. Objections, which divides the fraudulent draw downs by the respective institutions. See Tr. at 159:23-160:3 (Court, Bowles). V. Garcia asserted that he does not believe First Financial is a victim of V. Garcia's offense, because of his settlement agreement with it, but the Court noted that First Financial's credits should be applied at sentencing because First Financial's losses are included in the stipulated gross loss amount, with which V. Garcia agreed. See Tr. at 160:10-20 (Bowles, Court). V. Garcia later asserted that he does not agree that the net loss amount should be determined victim by victim, because the application notes discuss the determination of a loss amount and then the application of credits, but do not discuss "parsing out the victims." Tr. at 161:6-20 (Bowles). The Court responded that U.S.S.G. § 2B1.1., cmt. n.3(E)(i) indicates that the credits should be applied to individual victims. See Tr. at 161:23-162:1 (Court). The Court inquired whether V. Garcia agrees that dividing the losses and credits amongst the victims would wipe out the stipulated gross loss amount, and V. Garcia stated that he agrees. See Tr. at 162:13-24 (Court, Bowles).

The Court inquired whether the United States agrees that V. Garcia did not return any money to the victims, and thus U.S.S.G. § 2B1.1, cmt. n.3(E)(ii), not cmt. n.3(E)(i) applies, and the United States stated that it agrees. See Tr. at 164:1-4 (Court, Gerson). The United States admitted that it has not seen any case where collateral pledged was reduced pro rata by the loan

for which it was pledged.  See Tr. at 164:18-23 (Court, Gerson).  The United States asserted, nonetheless, that V. Garcia's situation is different, because the cases that have dealt with U.S.S.G. § 2B1.1, cmt. n.3(E)(ii) have discussed collateral pledged against a loan, which formed the basis of a defendant's criminal conduct, rather than collateral pledged against loans on which a defendant made fraudulent draw downs, as V. Garcia has done here.  See Tr. at 165:1-21 (Gerson, Court).  The United States asserted that the Court is not required to apply V. Garcia's collateral in a reasonable fashion against the losses, and the Court is not required to apply his credits dollar for dollar against his fraudulent draw downs.  See Tr. at 165:21-166:1 (Gerson).

V. Garcia asserted that he pledged his personal property and assets as collateral for his loans with both Columbian Bank and First Financial.  See Tr. at 166:11-12 (Bowles).  The United States did not dispute that assertion.  See Tr. at 166:22-23 (Court, Gerson).  The United States asserted that the gross loss amount is not limited to V. Garcia's count of conviction -- count three -- but is rather based upon counts one through seven.  See Tr. at 167:14-23 (Gerson).

The Court inquired of the parties if they agreed with the USPO's use of the most recent appraisals for the value of Lockhaven Estates and Copper Square.  See Tr. at 168:22-169:3 (Court).  V. Garcia stated that he believes that the guidelines use the value of an asset at the time of sentencing, and that the Court should estimate the value of the properties, and stated that he believes the most recent appraisals are "probably the more accurate" for determining the value of the properties.  Tr. at 169:4-10 (Bowles).  The United States stated that it believes the Court could either accept the most recent appraisals or attempt to determine the accuracy of the appraisals.  See Tr. at 170:10-11 (Gerson).  The United States stated that, for the appraisals

which are separated by a period of years, rather than months, it would likely be more appropriate to use the most recent appraisals.  See Tr. at 170:11-18 (Gerson).

Regarding V. Garcia's remaining objections, V. Garcia stated that he believes that, if the Court resolves the objections which were discussed at the hearing, the Court may not need to rule on his remaining objections, as they may be resolved by the Court's ruling.  See Tr. at 171:7-25 (Court, Bowles).  The parties agreed that, if the Court rules on the issues discussed at the hearing, the Court's ruling could potentially eliminate any remaining objections.  See Tr. at 175:3-7 (Bowles).  Regarding V. Garcia's objection to paragraph 62 of the PSR, which applies an enhancement for V. Garcia's use of sophisticated means in committing the offense, V. Garcia stated that he is "willing to stand on the briefs."  Tr. at 175:8-15 (Court, Bowles).  The United States asserted that the facts of V. Garcia's offense support the enhancement.  See Tr. at 175:5-11 (Gerson).

## LAW REGARDING RELEVANT CONDUCT AT SENTENCING

In calculating an appropriate sentence, the guidelines consider a defendant's "offense of conviction and all relevant conduct under [U.S.S.G.] § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context."  U.S.S.G. § 1B1.1, cmt. n.1(H).  In United States v. Booker, the Supreme Court noted:

> Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the real conduct that underlies the crime of conviction.  That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," . . . can encompass a vast range of very different kinds of underlying conduct.

- 70 -

543 U.S. at 250-51 (quoting 18 U.S.C. § 1951(a))(emphasis in original).  The Supreme Court's

reasoning in United States v. Booker suggests that the consideration of real conduct is necessary

to effectuate Congress' purpose in enacting the guidelines.

Section 1B1.3 provides that the base offense level under the guidelines "shall be

determined" based on the following:

> (1)     (A)    all acts and omissions committed, aided, abetted, counseled,
> commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)     in the case of a jointly undertaken criminal activity (a criminal
> plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with
> others, whether or not charged as a conspiracy), all reasonably foreseeable acts
> and omissions of others in furtherance of the jointly undertaken criminal activity,
> that occurred during the commission of the offense of conviction, in preparation
> for that offense, or in the course of attempting to avoid detection or responsibility
> for that offense;
>
> (2)     solely with respect to offenses of a character for which [U.S.S.G.] §
> 3D1.2(d) would require grouping of multiple counts, all acts and omissions
> described in subdivisions (1)(A) and (1)(B) above that were part of the same
> course of conduct or common scheme or plan as the offense of conviction;
>
> (3)     all harm that resulted from the acts and omissions specified in subsections
> (a)(1) and (a)(2) above, and all harm that was the object of such acts and
> omissions; and
>
> (4)     any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4).  The court may consider, as relevant conduct, actions that have not

resulted in a conviction.  Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards

lower than beyond a reasonable doubt are permitted to show relevant conduct.  The court may

rely upon reliable hearsay information, so long as there as the evidence meets the preponderance-

of-the-evidence standard.  See United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M.

- 71 -

2007)(Browning J.).    Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review.").[21]  The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

### 1.    The Supreme Court's Relevant Conduct Jurisprudence.

In Witte v. United States, 515 U.S. 389 (1995), the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge.  The defendant in Witte v. United States had been involved in an unsuccessful 1990 attempt to import marijuana and cocaine into the United States, and in a 1991 attempt to import marijuana.  See 515 U.S. at 392-93.  In March 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association with the defendant's latter attempt to import

---

[21] United States v. Schmidt is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . .  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that United States v. Schmidt has persuasive value with respect to a material issue, and will assist the Court in its disposition of this memorandum opinion and order.

narcotics.  See Witte v. United States, 515 U.S. at 392-93.  At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and therefore calculated the defendant's base offense level based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See Witte v. United States, 515 U.S. at 394.

In September 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with the 1990 activities.  See Witte v. United States, 515 U.S. at 392-93.  The defendant moved to dismiss the indictment, arguing that he had already been punished for the cocaine offenses, because the district court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See Witte v. United States, 515 U.S. at 395.  The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the Double Jeopardy Clause's prohibition against multiple punishments.  See 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed the district court and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Circuit Courts of Appeals, including the United States Court of Appeals for the Tenth Circuit that had previously considered this question.  See 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the circuits and affirmed the Fifth Circuit.  See 515 U.S. at 395.  In finding that the district court's consideration

of the defendant's relevant conduct did not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted." 515 U.S. at 401. The Supreme Court reasoned that sentencing courts had always considered relevant conduct and "the fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." 515 U.S. at 402.  Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." 515 U.S. at 403.

In United States v. Watts, 519 U.S. 148 (1997), the Supreme Court, in a per curiam opinion, relied upon Witte v. United States' holding and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted.  In reaching its result in United States v. Watts, the Supreme Court noted that its conclusion was in accord with every Circuit Court of Appeals -- other than the United States Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, if the government establishes that conduct by a preponderance of the evidence.  See 519 U.S. at 149 (citing, among other authorities, United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)).  The Supreme Court began its analysis in United States v. Watts with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an

offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.  See United States v. Watts, 519 U.S. at 151. According to the Supreme Court, 18 U.S.C. § 3661 embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion."  United States v. Watts, 519 U.S. at 151-52.

### 2.     The Tenth Circuit's Relevant-Conduct Jurisprudence.

Tenth Circuit case law adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts.  See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career offender enhancement does not violate the Double Jeopardy Clause of the Fifth Amendment).  In United States v. Banda, 168 F. App'x 284 (10th Cir. 2006)(unpublished), the Tenth Circuit rejected a defendant's argument that it was "structural error" for the a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard."  168 F. App'x at 290.  The Tenth Circuit explained that "'It is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment.  Instead, the constitutional error was the court's reliance on judge-found facts to enhance the defendant's sentence mandatorily.'"  168 F. App'x at 290 (quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)).

In United States v. Coleman, the defendant, Troy Coleman, appealed the district court's enhancement of his sentence for firearms possession after he was convicted of conspiracy to possess and possession of a controlled substance with intent to distribute, but was acquitted of

using or carrying a firearm during and in relation to a drug trafficking crime.  See 947 F.2d at 1428.  The Tenth Circuit acknowledged that courts had taken various positions whether a sentence may be enhanced for firearms possession despite a defendant's acquittal of firearms charges.  See United States v. Coleman, 947 F.2d at 1428-29 (citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing Coleman's sentence for possession of a firearm.  See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit based its conclusion on evidence that: (i) two weapons had been located at the arrest scene; (ii) the weapons were handled at will by individuals who lived at the house; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved. See United States v. Coleman, 947 F.2d at 1429.  The Tenth Circuit summarized that, in reviewing federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." United States v. Coleman, 947 F.2d at 1429.

In United States v. Washington, 11 F.3d 1510 (10th Cir. 1993), the defendant, Patrick Washington, argued that the United States should prove drug quantities used as relevant conduct

to establish a defendant's offense level by clear-and-convincing evidence rather than by a preponderance of the evidence.  See 11 F.3d at 1512.  The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, and which the court found by a preponderance of the evidence, increased his guideline sentence range from 210 to 262 months, to life.  The defendant argued "that because the additional drug quantities effectively resulted in a life sentence a higher standard of proof should be required."  United States v. Washington, 11 F.3d at 1515.  Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." 11 F.3d at 1516 (citing McMillan v. Pennsylvania, 477 U.S. at 84). [22]

_____

[22] Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since classified its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(quoting United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)).  See United States v. Olsen, 519 F.3d at 1105 (affirming the preponderance of the evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)).  The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence.  See United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation); United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance of the evidence standard for facts that enhance a defendant's offense level four-levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted

**RELEVANT LAW REGARING LOSS CALCULATION UNDER U.S.S.G. § 2B1.1**

Section 2B1.1 of the United States Sentencing Guidelines guides a court when sentencing a defendant for "Larceny, Embezzlement, and other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." U.S.S.G. § 2B1.1. Part of a court's duty when sentencing under U.S.S.G. § 2B1.1 is to determine whether a defendant's base offense level should be increased because of the amount of loss the offense caused. See U.S.S.G. § 2B1.1(b)(1)("If the loss exceeded $5,000, increase the offense level as follows . . . ."). "The court need only make  reasonable estimate of the loss." U.S.S.G. § 2B1.1, cmt. n.3(C). The Sentencing Guidelines neither proscribe, nor prohibit, a methodology for a court to use when calculating the "reasonable estimate" of the loss a defendant's conduct caused. See United States v. Erpenbeck, 532 F.3d 423, 433 (6th Cir.), cert denied, 129 S. Ct. 518 (2008)(rejecting a defendant's argument that the entire value of collateral that he pledged for a legitimate loan should be used to off-set his fraudulent transactions, and holding that the collateral should be reduced pro-rata based upon the ratio of the fraudulent transactions to the underlying, legitimate loan).

Loss is "the greater of actual or intended loss." U.S.S.G. § 2B1.1, cmt. n.3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.SG. § 2B1.1, cmt. n.3(A)(i). "'Intended loss' . . . means the pecuniary harm that was intended to result from the offense." U.S.S.G. § 2B1.1, cmt. n.3(A)(ii). "Offense" within the definition of

---

charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument).

either actual or intended loss refers to a defendant's relevant conduct, as determined by U.S.S.G § 1B1.3.   See United States v. Holbert, 285, F.3d 1257, 1261, 1261 n.3 (10th Cir. 2002)(explaining that the Sentencing Guidelines explicitly differentiate between the terms "offense of conviction," which "encompasses only facts immediately related to the specific offense for which the defendant was convicted," and "offense," which "'means offense of conviction and all relevant conduct,'" and that, "[w]hen the Sentencing Commission intends to limit the applicability of a victim-related enhancement" to the offense of conviction "it does so explicitly" (quoting U.S.S.G. § 1B1.1, cmt. n.1(H)); Robert W. Haines, Jr., et al., Federal Sentencing Guidelines Handbook § 2B1.1, § 5, at 335 (2012-13 ed.)("Guidelines Handbook")(explaining that the Commission intended for the meaning of "offense" to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3 and that the omission of a cross-reference to U.S.S.G. § 1B1.3 in the application notes to U.S.S.G. § 2B1.1 is of no "substantive significance," because "the drafters apparently felt that the cross-reference to § 1B1.3 was unnecessary because the relevant conduct rules apply to all offense types").   Additionally, "the Commission makes clear that a loss that 'resulted from' an offense is one that would not have occurred but for the occurrence of the offense," but a defendant's liability is limited to those losses "foreseeable to a reasonable person."   Guidelines Handbook § 5, at 334 (emphasis in original)("The loss definition in 2B1.1 . . . .  insists, as a minimum, that the defendant's offense have been a cause-in-fact of the economic harm at issue.").

When the loss amount is disputed, the United States bears the burden of establishing its estimation of loss by a preponderance of the evidence.   See Guidelines Handbook § 14, at 353. The Tenth Circuit has, accordingly, ruled that a district court cannot include losses in its

calculation under § 2B1.1 until the "Government first . . . prove[s] by a preponderance of the evidence that the conduct giving rise to those losses (1) was a part of Defendant's ongoing scheme . . . and (2) constituted a criminal offense under a federal or state statute." United States v. Kieffer, 681 F.3d at 1168.  Next, the United States must "prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence." United States v. Kieffer, 681 F.3d at 1168 (citing United States v. Peterson, 312 F.3d 1300, 1302 (10th Cir. 2002)).  For example, in United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814 (D.N.M. June 22, 2012)(Browning, J.), the Court determined that an enhancement pursuant to U.S.S.G. § 2B1.1(b)(1) was unwarranted, because, although the United States contended that a New Mexico Corrections Department facilities manager awarded four million dollars worth of state government contracts to a developer in exchange for bribes, the United States submitted no evidence regarding the profit, if any, the developer received from the contracts.  See 2012 WL 2574814, at *1, **9-10.  The Court noted that, without "evidence regarding the value of the benefit Moya received under these government contracts, the United States cannot establish by a preponderance of the evidence that an . . . enhancement is appropriate . . . ." under U.S.S.G. § 2B1.1(b)(1).  2012 WL 2574814, at *10.

The application notes to U.S.S.G. § 2B1.1 provide that a court shall reduce the loss by certain credits.  First, the court shall reduce the loss by the "money returned, and the fair market value of the property returned and the services rendered by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."  U.S.S.G. § 2B1.1, cmt. n.3(E)(i).  "[W]hen no actual sales price is available to calculate loss, the Guidelines permit a district court 'to *estimate* loss based on *available* information.'"  United States v. Snow, 663

F.3d at 1161 (quoting United States v. James, 592 F.3d 1109, 1116 (10th Cir. 2010)(secondary

quotations omitted)).  See United States v. Merriman, 647 F.3d 1002 (10th Cir. 2011)("[T]he

Guidelines permit a reduction for restoring victims' losses prior to the onset of any government

involvement, . . . not . . . when payments are not returned to the victims until after the crime has

been discovered by the government and the defendant has . . . motivation to use his ill-gotten

gains as leverage . . . .").  The application notes indicate that value returned should be credited

against the losses that the victim who received the value suffered, and not against a lump sum of

total losses where there are more than one victims: For example, in a case involving a ponzi or

other fraudulent investment scheme, value which one investor receives in excess of that

investor's principal investment "shall not be used to offset the loss to another individual investor

in the scheme."  U.S.S.G. § 2B1.1, cmt. n.3(F)(iv).

Second, the court shall reduce the loss, in "a case involving collateral pledged or

otherwise provided by the defendant, [by] the amount the victim has recovered at the time of

sentencing from disposition of the collateral," or if the collateral has not been disposed of by

sentencing, "the fair market value of the collateral at the time of sentencing."  U.S.S.G. § 2B1.1,

cmt. n.3(E)(ii).  As the Tenth Circuit has explained, "actual loss should be measured by the net

value, not the gross value, of what was taken when the defendant pledged collateral to secure a

fraudulent loan."  United States v. Snow, 663 F.3d at 1161.  "Where a lender has foreclosed and

sold the collateral, the net loss should be determined by subtracting the sales price from the

outstanding balance on the loan."  United States v. Washington, 634 F.3d 1180, 1184 (10th Cir.

2011)(citing United States v. James, 592 F.3d at 1114).  Collateral may not be used to offset

losses, however, if the defendant "'intended to permanently deprive the creditor of the collateral

through concealment.'"   United States v. Schild, 269 F.3d 1198, 1201-02 (10th Cir. 2011)(quoting United States v. Nichols, 229 F.3d 975, 979 (10th Cir. 2000)(holding that a defendant convicted of bank fraud may not receive an offset to the loss his offense incurred based on the cattle he pledged as collateral where he sold the cattle, and, thus, the bank could not levy thereon).  Additionally, U.S.S.G. § 2B1.1, cmt. n.3(E)(ii) "cannot reasonably be interpreted as limiting credits to collateral for which the defendant is himself the pledger;" rather, collateral pledged reduces a victim's losses irrespective of which defendant, if there are multiple, pledged the collateral.  Guidelines Handbook § 10, at 345 ("The bank suffered only one actual financial loss arising from the concerted action of the two defendants -- a loss objectively measurable by subtracting the value of the collateral from the amount of the loan.").  "A court may properly accept a variety of kinds of evidence about the value of the collateral pledged by the defendant, and it need not determine that value to the penny."  Guidelines Handbook § 14, at 353.

## LAW REGARDING THE USE OF "SOPHISTICATED MEANS" TO COMMIT FRAUD

U.S.S.G. § 2B1.1(b)(10)(C) provides that, "[i]f the offense involves sophisticated means, increase by 2 levels.  If the resulting offense is less than level 12, increase to level 12."  U.S.S.G. § 2B1.1(b)(10)(C).  Application Note 8 provides, "[f]or the purposes of subsection (b)(2), 'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . .  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts ordinarily indicates sophisticated means."  U.S.S.G. § 2B1.1, cmt. n.8(B).

"The possession of false document-making implements may constitute sophisticated means, as may creation of numerous false documents, even if the documents were easily generated and contained only simple falsehoods." Guidelines Handbook §27, at 390. The Tenth Circuit first addressed the enhancement for sophisticated means in the commission of tax evasion in United States v. Rice, 52 F.3d 843 (10th Cir. 1995).[23]  In United States v. Rice, the defendant received a "tax refund based on excessive withholding that was never in fact withheld." 52 F.3d at 845. The district court applied the sophisticated-means enhancement, "in part because [the defendant] contested the IRS' ability to require him to produce documents during the civil phase of his case." 52 F.3d at 849. The Tenth Circuit held that the defendant's tax evasion scheme was not sophisticated, because it was "the functional equivalent of claiming more in itemized deductions than actually paid." 52 F.3d at 849. In so holding, the Tenth Circuit noted that, if the defendant's scheme was sophisticated, then "every fraudulent tax return will fall within that enhancement's rubric." United States v. Rice, 52 F.3d at 849. In United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999), the Tenth Circuit found that the district court's application of the sophisticated-means enhancement was appropriate, even though the defendant did not use a sham corporation or offshore bank accounts. See 199 F.3d at 1158. The defendant in United States v. Guidry made her embezzlement particularly difficult to detect by using checks that were made payable to a bank, not herself, which are harder to trace, by only depositing a small fraction of her embezzled funds in a bank, which made her embezzlement difficult for the IRS to investigate, and by never withdrawing more than $10,000.00 in one day, which demonstrated

---

[23] The Sentencing Guidelines' enhancement for the use of sophisticated means in the commission of offenses falling under U.S.S.G. § 2B1.1 and U.S.S.G. § 2T1.1 are identical, save for the explanatory examples provided for applying the enhancement under U.S.S.G. § 2B1.1. Compare U.S.S.G § 2B1.1, cmt. n.8(B), with U.S.S.G. § 2T1.1, cmt. n.4.

that she knew that depositing any more would require the bank to notify the IRS of the deposit, and thus further demonstrated that she understood how to use sophisticated means to conceal her embezzlement.  See 199 F.3d at 1158.  The Tenth Circuit held that using multiple storage units to hold items purchased with embezzled funds had a similar effect, and that her case was not simply one of representing to have paid withholding taxes not paid or not disclosing one's income.  See United States v. Guidry, 199 F.3d at 1158 (citing United States v. Rice, 52 F.3d at 849; United States v. Stokes, 998 F.2d 279, 282 (5th Cir. 1993)).

The Tenth Circuit has upheld the application of a sophisticated-means enhancement to a defendant who conducted seminars on avoiding tax liability and "assisted in the preparation of tax returns that were false and fraudulent as to a material matter."  United States v. Ambort, 405 F.3d 1109, 1113 (10th Cir. 2005).  In United States v. Ambort, the Tenth Circuit found that there was ample evidence in the record to support a sophisticated-means enhancement, because the defendant's program was designed to provide a basis that someone could later articulate as to why they were entitled to the tax status they advanced and included discussions about what information should not be included in tax forms to avoid traceability.  See 405 F.3d at 1120.

In United States v. Snow, the Tenth Circuit held that a district court properly applied an enhancement for the use of sophisticated means under U.S.S.G. § 2B1.1, where the defendant "did not undertake to execute or conceal merely a single fraudulent transaction using false documentation but orchestrated a vast and complex fraud scheme in which he participated in over forty fraudulent mortgage-related transactions to defraud at least twelve different financial institutions."  663 F.3d at 1163.  The Tenth Circuit determined that the defendant's fraudulent scheme was complex, because of the lengths which the defendant took to execute the fraud, and also because the defendant successfully deceived numerous financial institutions and title

companies, indicating that he necessarily used sophisticated mean to "fool trained and experienced bank and closing personnel." 663 F.3d at 1163.  That the defendant provided, and directed others to provide, fraudulent documentation and information sufficient to deceive the personnel reviewing it, procured and instructed others to procure cashiers' checks to disguise the true source of his income, and circulated and instructed others to circulate funds through different bank accounts to avoid detections indicated that he used sophisticated means.  See 663 F.3d at 1163.  With these facts, the Tenth Circuit determined that the district court properly applied a sophisticated means enhancement to the defendant's sentence under U.S.S.G § 2B1.1.  Similarly, in United States v. Tilga, 824 F. Supp. 2d 1295 (D.N.M. 2011)(Browning, J.), the Court found that an enhancement for the defendant's use of sophisticated means was warranted where the defendant used offshore accounts and shell companies to evade taxes by hiding the amount of money she earned.  See 824 F. Supp. 2d at 1330-34.  The Court explained that the application notes to the sentencing guidelines regarding the use of sophisticated means recognizes that the enhancement applies because of the inherent complexity of the entities a defendant uses, and not because a defendant used the entities "in an especially complex or novel manner."  824 F. Supp. 2d at 1330-31.  Moreover, the Court explained that the case law addressing the use of sophisticated means does not require that a defendant create the sophisticated means, but rather, "[t]here is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement."  824 F. Supp. 2d at 1332.

Additionally, the United States Court of Appeals for the Sixth Circuit has upheld the imposition of a sophisticated-means enhancement where the defendant created and used fictitious trusts to hide assets from the Internal Revenue Service, even though the defendant was

not a sophisticated businessman and no offshore trusts were involved.  See United States v. Schwartz, 408 F. App'x 868, 870 (6th Cir. 2010)(unpublished).  The United States Court of Appeals for the Seventh Circuit, in United States v. Minneman, 143 F.3d 1274 (7th Cir. 1998), held that the use of multiple corporate names and the placement of funds in a trust account both constitute complex efforts to hide income.  See 143 F.3d at 1283.

## ANALYSIS

The Court overrules in part and sustains in part the parties' objections to the PSR.  The Court agrees with the parties that the gross loss amount that V. Garcia's relevant conduct incurred is limited to the amount of fraudulent draw downs submitted to the lending institutions. The United States has not argued, and the Court has no evidence to conclude, that V. Garcia's default on over $20,000,000.00 of loans was a "reasonably foreseeable pecuniary harm that resulted from" V. Garcia's submission of less than $1,000,000.00 in fraudulent draw downs. U.S.S.G. § 2B1.1, cmt. n.3(A)(i).  To the contrary, V. Garcia has submitted evidence which generally prevailing market factors that depressed the commercial real estate market caused him to default on his loans, and the United States does not argue otherwise.  On the other hand, the evidence before the Court demonstrates that the sum total of V. Garcia's fraudulent draw downs is $842,708.79, not $842,237.44, as the parties have stipulated, and, thus, the Court will not accept the parties' stipulated gross loss amount, but will rather use the former figure as the gross loss amount.  The Court will offset the gross loss amount by V. Garcia's credits on a victim by victim basis, according to the losses First Financial and Columbian Bank suffered minus the credits they have received or are entitled to receive.  The Court will not accept V. Garcia's proposition that the full value of his credits should offset the gross loss amount, as the gross loss amount is only a portion of the legitimate loans that his pledged collateral supported.  The Court

finds that a proportionate reduction of the credits by the ratio of the fraudulent draw downs to the outstanding balance of the underlying loans is a reasonable method for reducing the credits to reflect the value of the credits that offset V. Garcia's gross loss amount.

Regarding V. Garcia's other objections to the PSR's sentencing enhancements, the Court will overrule the objections in part and sustain in part. The Court finds that V. Garcia did not use sophisticated means to commit bank fraud, and, thus, sustains V. Garcia's objection to a sentencing enhancement pursuant to U.S.S.G § 2B1.1(b)(10)(C). The Court agrees with V. Garcia that there were less than ten victims in this case, because the Court has no evidence that V. Garcia's fraudulent draw downs totaling less than $1,000,000.00 caused certain subcontractors' to not receive over $2,000,000.00 for their services. V. Garcia has submitted evidence, to which the United States does not object, that certain subcontractors were not paid because of the difficulty V. Garcia experienced with generally prevailing market factors that depressed the commercial real estate market. The United States does not argue that subcontractors were unpaid because of V. Garcia's bank fraud. The Court, therefore, has no evidence to conclude that certain subcontractors sustained pecuniary harm reasonably foreseeable to result from V. Garcia's fraudulent draw downs, and, without the subcontractors as victims, the only victims before the Court are First Financial and the FDIC, as Columbian Bank's receiver. The Court will, thus, sustain V. Garcia's objection to a sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(2).

I.   **THE GROSS LOSS V. GARCIA'S BANK FRAUD CAUSED IS THE SUM TOTAL OF THE FRAUDULENT DRAW DOWNS SUBMITTED TO FIRST <u>FINANCIAL AND COLUMBIAN BANK</u>.**

In the Plea Agreement, the parties stipulated to a gross loss amount of $842,237.44, but did not fully explain how they arrived at that figure. <u>See</u> Plea Agreement ¶ 10(b), at 6. The

USPO determined that the actual loss and intended loss caused by V. Garcia's conduct was the same figure, and that total is $23,550,835.69, based upon the outstanding balance of V. Garcia's loans with First Financial and Columbian Bank, on which he defaulted, and the amount of the subcontractors' liens filed against V. Garcia's properties.  See PSR ¶ 60, at 22.  Both parties object to the USPO's calculation of the gross loss amount, because, they argue, V. Garcia's default and failure to pay certain subcontractors was not part of his relevant conduct.  See U.S. Objections at 2-3; V. Garcia Objections at 1-2.  The Court agrees with the parties that V. Garcia's default on his loans with First Financial and Columbian Bank and his failure to pay certain subcontractors, was not a harm that resulted from his bank fraud, nor were these harms part of the same course or scheme or endeavor to defraud the lending institutions, and thus, losses incurred beyond V. Garcia's fraudulent draw downs are not part of the gross loss amount. See, e.g., U.S.S.G § 1B1.3, cmt. n.2.

For purposes of determining the loss an offense caused under U.S.S.G. § 2B1.1(b), a defendant's offense is the defendant's relevant conduct under U.S.S.G. § 1B1.3.  See Guidelines Handbook § 5, at 335 (explaining that the Commission intended for the meaning of "the offense" for the purposes of determining loss to refer to a defendant's relevant conduct under U.S.S.G. § 1B1.3).  V. Garcia's relevant conduct is all "acts and omissions [he] committed, aided, abetted, counseled, commanded, inducted, procured, or willfully caused," and "all reasonably foreseeable acts and omission of others in furtherance of the jointly undertaken criminal activity."  U.S.S.G. § 1B1.3 (A),(B).  V. Garcia pled guilty to one of the nineteen counts charged in the Indictment -- bank fraud through the submission of a draw-down request in the amount of $365,677.00 based upon a fraudulent invoice.  See Plea Agreement ¶ 8(b), at 4; Indictment at 3.  V. Garcia was charged with six other counts of bank fraud, all of which relate to the same "plan" or "scheme"

he effectuated with Barnhill to obtain funds from First Financial and Columbian Bank to be used other than for the construction expenses represented to the lending institutions.  See Indictment at 3-4; PSR ¶¶ 33-36, at 13-15; U.S. Objections at 3; V. Garcia Objections at 20.  The Court concludes that it was reasonably foreseeable to V. Garcia that Barnhill would obtain the draw downs that V. Garcia directed through fraudulent means: V. Garcia admits that he directed Barnhill to request the draw downs, and he does not contest that the funds obtained were not used for legitimate construction expenses.  See Plea Agreement ¶ 8(b), at 4, PSR ¶¶ 33-36, at 13-15; V. Garcia Objections at 20.  The Court thus concludes that the losses the lending institutions incurred because of the fraudulent draw downs was a pecuniary harm which V. Garcia should have reasonably foreseen, given his admitted conduct of directing Barnhill to request fraudulent draw downs.  See U.S.S.G. § 2B1.1, cmt. n.3(A)(i).  The Court also agrees with the USPO that there is no evidence that V. Garcia intended to cause a pecuniary harm beyond that which resulted from the fraudulent draw downs.  See PSR ¶ 60, at 22; U.S.S.G § 2B1.1, cmt. n.3(A)(ii); United States v. Small, 210 F. App'x at 779 (upholding an actual loss calculation where there was no evidence that a defendant "intended a greater loss than the actual loss . . . .").  Rather, V. Garcia's purchase of the J&J Casino to increase his liquidity indicates that he intended to recoup the funds obtained through the draw downs, and more, in other business endeavors.  See Plea Agreement ¶¶ 8(b)-(c), at 4 (V. Garcia states that he knew the $365,677.00 in the February 13, 2007, draw down would not be used for the Downtown Anasazi, as Barnhill represented to Columbian Bank, but that he also intended to "provide additional cash for the completion of the building if the casino proved successful," and that he purchased the casino in an attempt to increase his liquidity.).

On the other hand, the Court does not agree with the USPO's conclusion that V. Garcia's default on the Downtown Anasazi, Copper Square, and Lockhaven Estates loans, and his failure to pay certain subcontractors, are part of V. Garcia's relevant conduct in committing bank fraud. There is no evidence that V. Garcia willfully defaulted on his loans.   See U.S.S.G. § 1B1.3(a)(1)(A)(defining relevant conduct as all acts a defendant "willfully caused").[24]   To the contrary, V. Garcia's purchase of the J&J Casino, although misguided, demonstrates that he was attempting to acquire more funds to complete the construction, and possibly to pay subcontractors for their services.   Neither is there evidence before the Court that the fraudulent

_____

[24] The USPO includes in the PSR certain facts upon which it likely based its conclusion that V. Garcia's defaults and failure to pay subcontractors are part of his relevant conduct and reasonably foreseeable pecuniary harms.  The PSR states that V. Garcia took "loan funds to pay for personal living expenses" and "personal property,"  PSR ¶ 13, at 4, that he employed a bookkeeper as opposed to an accountant so as to hide the "financial discrepancies" in Blue Dot's books, PSR ¶ 14, at 5, that he had no interest in completing the Downtown Anasazi, see PSR ¶ 15, at 5, that he took funds from the Copper Square loan "directly to his pocket," PSR ¶ 16, at 6, and that any loan proceeds from Columbian Bank that "contributed to any salaries of the corporation were unapproved," PSR ¶ 23, at 8.  V. Garcia objects to these statements, and the United States has provided no evidence or argument in support of the statements.  See V. Garcia Objections at 10-24.   Rather, the United States asserts that the relevant conduct upon which the USPO bases its calculation of the gross loss amount is not the relevant conduct of V. Garcia's offense.  See U.S. Objections at 5.   The United States has not, therefore, shown by a preponderance of the evidence that V. Garcia's relevant conduct included the failure to pay subcontractors or the general misuse of loan funds, nor that the failure to pay subcontractors and V. Garcia's default was reasonably foreseeable to result from the bank fraud of which V. Garcia is convicted.  In the absence of evidence in support of the statements in the PSR, the Court cannot conclude soundly that V. Garcia's defaults and failure to pay contractors are pecuniary harm included in the actual loss his bank fraud caused.  See United States v. Orr, 567 F.3d at 617-18 (finding that district court erred in accepting statements in a PSR regarding relevant conduct and the number of a defendant's victims, where, although the government argued in support of the PSR's statements, it provided no evidence to substantiate the allegation that the number of victims of the defendant's offense was more than seventy, and the defendant objected to the PSR's statements); United States v. Kieffer, F.3d at 1169 ("The likelihood that certain facts bearing upon Defendant's offense level exist, no matter how probable, does not relieve the Government of its burden, after proper objection, to establish their actuality.").  Moreover, the Court's thorough review of the record does not support the USPO's conclusion that the preponderance of the evidence supports that V. Garcia's default was a reasonably foreseeable result of the fraudulent draw downs.

draw downs were the but-for cause of V. Garcia's defaults or failure to pay the subcontractors.

See Guidelines Handbook § 5, at 334 ("[T]he Commission makes clear that a loss that 'resulted from' an offense is one that would not have occurred but for the occurrence of the offense," but a defendant's liability is limited to those losses "foreseeable to a reasonable person." (emphasis in original)).[25]  V. Garcia has presented evidence, to which the United States does not object, that his development plans failed because of the generally prevailing economic downturn at the time.

See Tr. at 91:21-92:9 (Bowles, Ilfeld)(A: "[T]here was significantly decreased demand for commercial property, lease space, and ownership because companies . . . revenues['] were declining, and so it was kind of a domino effect resulting in a severely depressed commercial real estate market in the period probably staring from . . . early 2008's . . .  It's . . . nationwide . . . it's certainly statewide").  V. Garcia's development plans were based upon the sale of units in

---

[25]  Regarding the subcontractors particularly, there is an argument, which the United States could have made, that but for V. Garcia's use of construction loan funds for purposes other than paying subcontractors, there would have been sufficient funds in the construction loans to pay subcontractors up to the amount V. Garcia fraudulently drew-down.  The United States did not make this argument, and specifically refutes that V. Garcia's failure to pay subcontractors is part of his relevant conduct.  Additionally, in the absence of evidence in support of this argument, the Court cannot conclude that the fraudulent draw downs were the proximate cause of the subcontractors non-payment, as the sentencing guidelines requires when calculating the gross loss amount.  See U.S.S.G. § 2B1.1, cmt. n.3(a)(i).  The evidence before the Court indicates that V. Garcia's development projects were funded, at least in part, by unit sales, and not solely the construction loans.  See Tr. at 37:15-23 (Heyward)("[T]he plan was . . . to build additional units which would sell and the sale would generate lump sum reductions of principal on the loan, generate more cash flow for Mr. Garcia . . . .").  Thus, V. Garcia's evidence that the general economic downturn caused his projects to fail supports the possibility that the prevailing real estate market conditions, and not his fraudulent draw downs, caused him to be unable to pay subcontractors when, for example, downtown Albuquerque's "desirability as a place to locate businesses, and consequently to develop new real estate projects, flagged."  Defense Exhibit A at 3.  Additionally, although the PSR includes statements from certain subcontractors who assert they are unpaid for their work done on the Downtown Anasazi, there is no evidence specifically connecting a fraudulent draw down with an invoice from a subcontractor that went unpaid.  See PSR ¶¶ 55-56, at 20.  Given V. Garcia's funding structure for his development plans, and the absence of evidence or argument from the United States, the Court cannot conclude that the fraudulent draw downs were the proximate cause of V. Garcia's nonpayment of certain subcontractors.

the properties, and a general depression of the commercial real estate market could logically have caused V. Garcia's plans to fail, notwithstanding the fraudulent draw-down requests.  <u>See</u> Tr. at 37:15-23 (Heyward)("[T]he plan was . . . to build additional units which would sell and the sale would generate lump sum reductions of principal on the loan, generate more cash flow for Mr. Garcia . . . .").  For example, it appears as though V. Garcia only sold one unit in Copper Square after the Copper Square loan was funded, a result which likely hampered his ability to fund the project, stay current on his loans, and pay subcontractors for their services.  <u>See</u> Tr. at 50:14-20 (Bowles, Heyward).  Moreover, even if V. Garcia had completed the Downtown Anasazi, the building would have still diminished in value "wholly apart from any other non-economic factors that may have contributed to" Columbian Bank's losses on the project. Defense Exhibit A at 3.

Additionally, the amount of V. Garcia's fraudulent draw downs as compared to his underlying loans makes it difficult for the Court to believe that V. Garcia could have reasonably foreseen -- as the Guidelines define that term -- that the $842,708,79 which V. Garcia fraudulent drew-down would cause him to default on over $20,000,000.00 of loans.  <u>See</u> U.S.S.G. § 2B1.1, cmt. n.3(A)(i)(defining actual loss as the "reasonably foreseeable pecuniary harm that resulted from the offense").  The same proportionate relationship renders the foreseeability of V. Garcia's inability to pay subcontractors unlikely: accepting either the $1,550,000.00 that V. Garcia estimates he owes subcontractors, <u>see</u> V. Garcia Objections at 20 or the $2,520,302.61 that the USPO reports in the PSR, <u>see</u> PSR ¶ 30, at 10-13; <u>id.</u> ¶¶ 55-56, at 20, V. Garcia's fraudulent draw downs amount to no more than half of the unpaid funds.  At most, V. Garcia's fraudulent draw downs accounts for approximately half of the amount he owes to subcontractors, and it is unlikely that V. Garcia could have reasonably foreseen that fraudulently drawing-down over

$842,708.79 from his loans would have made it impossible for him to pay twice that amount to subcontractors.  "Where a district court finds that the defendant did not reasonably foresee losses would be sustained," the court cannot include those losses in a defendant's gross loss amount under U.S.S.G. § 2B1.1.  United States v. Smith, 705 F.3d at 1276.  Conservatively, V. Garcia could have foreseen that using $842,708.79 for purposes other than the development projects would have caused him to default or not pay subcontractors by that amount; the Court, however, has another reason to not include this figure in the gross loss V. Garcia's bank fraud caused.

The burden is on the United States to establish the loss resulting from V. Garcia's relevant conduct.  See United States v. Kieffer, 681 F.3d at 1168 ("Assuming the Government met its initial burden of proving relevant conduct, it then had to prove the amount of loss (or a reasonable estimate thereof) associated with that conduct by a preponderance of the evidence.").  V. Garcia has submitted evidence that the fraudulent draw downs did not cause his defaults and failure to pay subcontractors, and the United States not only does not object to that evidence, but does not argue that V. Garcia's default or failure to pay subcontractors is part of his relevant conduct.  See U.S. Objections at 2 (referring to the defaults and subcontractors' liens and stating: "The government does not agree, however, that these losses are relevant conduct for the offense of conviction.").   Although the Court may properly consider acts which did not result in conviction, see U.S.S.G. 1B1.3, and conduct for which V. Garcia was not charged, see Witte v. United States, 515 U.S. at 402-03, the Court cannot conclude that V. Garcia's default on his loans and failure to pay subcontractors was part of the same "criminal plan, scheme, endeavor, or enterprise undertaken by" V. Garcia in concert with Barnhill in the absence of evidence to support that theory, and thus the Court will not consider the losses caused by the default and failure to pay subcontractors in the calculation of the gross loss amount.  U.S.S.G. § 1B1.3, cmt.

n.2.  In the absence of evidence from the United States that V. Garcia's bank fraud caused greater pecuniary harm than $842,708.79, the Court cannot, over V. Garcia's objections and evidence to the contrary, conclude that V. Garcia's defaults and failure to pay subcontractors was a reasonably foreseeable pecuniary harm resulting from his offense.  See United States v. Orr, 567 F.3d 617-18 (finding that a district court erred in accepting the government's estimated gross loss where a defendant objected to the government's estimated loss amount, and the government "failed to present any evidence to substantiate the allegations at the time of sentencing").  The Court concludes, therefore, that the gross loss amount that V. Garcia's bank fraud caused is $842,708.79.

The Court cannot agree, however, with some of the testimony and arguments that no one predicted this recession and the burst in the real estate bubble.  Clearly some did and made a lot of money as a result of correctly predicting the real estate and security markets.  But the Sentencing Guidelines do not say that the "reasonable person" has to do better than the Chairman of the Federal Reserve, Benjamin Bernanke.  See Paul Krugman, *How did Economists Get It So Wrong?*, N.Y. Times Magazine, Sept. 2, 2009, available at http://www.nytimes.com/2009/09/06/magazine/06Economic-t.html?pagewanted=all&_r=0 (explaining how the leading economists in the United States were surprised by the extent of recent years' economic downturn).  And while anybody in the market has to realize that there are booms and busts, many investors keep on investing like this time is different.  It may not be reasonable for people to keep on investing in hindsight, but they must be judged at the time.  Moreover, the Sentencing Guidelines do not say a "reasonable real estate investor" or "reasonable stock broker"; it says person.  And investing in real estate has been, over the country's history, a good way to make money.  The Court is

reluctant to say that someone is unreasonable simply because he took out a loan and tried to make a go of it.

Similarly, not all investments work out.  While it is never a good idea to engage in fraudulent investments, the unlikely investors which invest in a bust should not be saddled with all of the industries' losses.  Here, given the timing of this investment, the projects were doomed at the moment the loans were drawn.  V. Garcia did not help matters, but he did not cause all the losses here.  If he had been squeaky clean, the banks still might not have received back the balance of the loans and all the subcontractors may still not have been paid.

II.    **V. GARCIA'S CREDITS WILL BE APPLIED ON A VICTIM BY VICTIM BASIS AND REDUCED BY THE RATIO OF THE FRAUDULENT DRAW- DOWNS   TO THE OUSTANDING BALANCES ON V. GARCIA'S LOANS.**

The parties do not agree on a methodology for applying V. Garcia's credits to offset the gross loss amount.  Although the parties stipulated that U.S.S.G. § 2B1.1, cmt. n.3(E)(i) and (ii) should apply to V. Garcia's credits, they disagree as to its meaning.  The United States asserts that V. Garcia's credits, which are in the form of collateral he pledged to Columbian Bank and First Financial to support the loans, should be reduced pro rata by the ratio of V. Garcia's fraudulent draw downs to his underlying loans.  See U.S. Objections at 8-9; Tr. at 165:1-21 (Gerson).   The United States also contends that the Court should not accept V. Garcia's estimation of the value of his personal property pledged as collateral because he has provided no evidence to substantiate his estimates.  See U.S. Objections at 6.  V. Garcia asserts that, by the plain reading of U.S.S.G. § 2B1.1, cmt. n.3(E), the entire value of V. Garcia's collateral should be applied against the gross loss amount, resulting in a net loss of zero.  See PSR ¶ 60, at 21-24; V. Garcia Objections at 3.  He also asserts that he is competent to provide an estimate of the value of his personal property and that the Court should accept his estimates.  See Tr. at 139:6-13

(Bowles).  The USPO adopted V. Garcia's proposed application in the PSR and his estimate of the value of his personal property, but the USPO seems to disagree that the net losses should be zero.  See PSR ¶ 60, at 21-24; Tr. at 158:2-159:1 (Mills)(Mills indicating that the he believes the gross loss amount should include the outstanding balances of V. Garcia's loans with First Financial and Columbian Bank, and the subcontractors' liens, and, thus, the net loss amount would still be approximately $19,000,000.00 after the total value of V. Garcia's credits is applied against the gross loss amount, as he believes U.S.S.G. § 2B1.1, cmt. n.3(E) requires).  The Court "need only make a reasonable estimate of the loss," and the Court believes that the United States' proposed method for applying V. Garcia's credits to offset the gross loss amount is reasonable.  U.S.S.G. § 2B1.1, cmt. n.3(B).  The Court also believes that V. Garcia's estimate of the value of this personal property and assets is reasonably reliable, and the Court will adopt a conservative value of those items.

First, the Court will apply the credits on a victim by victim basis.  V. Garcia's collateral will be applied according to which lending institution he pledged it and will reduce the losses specific to that lending institution that his offense caused.  The United States asserts that the calculation of the net losses should be the same irrespective of whether V. Garcia's credits are applied victim by victim, or in a lump sum fashion.  See Tr. at 147:21-148:1 (Court, Gerson).  V. Garcia, however, asserts that the credits should be applied as a lump sum to offset the gross losses.  See id. at 162:6-162:9 (Bowles, Court).  The Court's method finds supports in the sentencing guidelines discussion of credits in the context of a Ponzi scheme.  For example, U.S.S.G. § 2B1.1, cmt. n.3(F)(iv), directs a court when sentencing a defendant according to the net losses the defendant's fraudulent investment scheme caused.  The application note provides that "loss shall not be reduced by the money or the value of the property transferred to any

individual investor in the scheme in excess of that investor's principal investment," thus, the excess value may "not be used to offset the loss to another individual investor in the scheme." U.S.S.G § 2B1.1, cmt. n.3(F)(iv).  This approach makes logical sense: the extra income which one investor received does not, apart from a court-order to the contrary, lessen the loss another investor suffered in the scheme.  Similarly, the lending institutions have the right to levy on V. Garcia's collateral that he pledged to each respective institution.  Moreover, the outcome is the same regardless whether the credits are attributed victim by victim or as a lump sum because the Court will reduce V. Garcia's credits pro rata.  Thus, V. Garcia's collateral will be applied to offset the losses of the lending institution that has the right to levy on the collateral.

Second, the Court will reduce V. Garcia's credits proportionate to the ratio of the fraudulent draw downs to the outstanding balance of underlying loan.  This approach is reasonable and supported by case law: the United States has neither charged nor argued that V. Garcia committed loan fraud or that the loans with First Financial and Columbian Bank were otherwise fraudulently obtained.  Additionally, the Court finds by a preponderance of the evidence, that the gross loss incurred by V. Garcia's bank fraud is the amount of the fraudulent draw downs; there is insufficient evidence for the Court to conclude that V. Garcia's bank fraud was the but-for cause of his defaults on the loans.  The gross loss amount reflects only a portion of the underlying loans for which the collateral was pledged.  The cases that have applied the total value of collateral pledged for a loan to offset losses do so when the underlying loan itself was fraudulently obtained.  As a general matter,

> [i]n cases where the defendant has pledged collateral to secure a fraudulent loan, . . . loss is calculated by subtracting the value of the collateral -- or, if the lender has foreclosed on and sold the collateral, the amount of the sales price -- from the amount of the outstanding balance on the loan."

United States v. James, 592 F.3d at 1114.  For example, in United States v. Nichols, the Tenth

Circuit found that it was clear error for a district court to not offset the losses caused by a

fraudulent loan application where a defendant secured the fraudulent loan with his home, which

had been appraised at $95,000.00.  See 229 F.3d at 979-80.  Similarly, in United States v. Snow,

the Tenth Circuit affirmed a district court's subtraction of the sales price and estimated fair

market values of properties pledged to secure a fraudulently obtained loan to calculate the net

loss the loan fraud caused.  See 663 F.3d at 1157, 1161-62.  In both of these cases, the full value

of the collateral offset the victims' losses, because the loan itself was fraudulently obtained.

Here, on the other hand, V. Garcia pledged collateral for a legitimate loan, and, as he asserts,

most of the loan proceeds were used to fund the construction work for which the loan was

obtained.  See V. Garcia Objections at 11-13 (asserting that "the only loan that was fully funded

was the Lockhaven loan, and that project was 100% complete," and that the majority of

subcontractors' work "performed had been paid for").  To apply the total value of V. Garcia's

collateral to offset the fraudulent draw downs would ignore the reality that V. Garcia's collateral

was used to secure a legitimate loan, only a portion of which was fraudulently drawn-down.  See

Tr. at 141:8-21 (Gerson)("The credits for collateral for fraudulent draw down request.  They

were collateral for bank loans.  They were not collateral for fraudulent draw down requests.").

Accordingly, the Court finds that the United States' proposed method for reducing V. Garcia's

credits by the ratio of the fraudulent draw downs to the underlying legitimate loans is a

reasonable method for calculating the net losses V. Garcia's bank fraud caused.  Another circuit

has adopted this approach when offsetting the losses a defendant's bank fraud caused, where the

loss was less than the total amount of a loan for which the defendant pledged collateral.  The

defendant in United States v. Erpenbeck, A. William Erpenbeck, Jr., similar to V. Garcia,

committed bank fraud through diverting construction loan funds to pay for non-construction expenses.  To secure his loans, Erpenbeck pledged collateral and granted the defrauded banks liens on the homes he constructed.  By the time Erpenbeck's fraud was discovered, he owed $6,900,000.00 to Bank One, one of the defrauded banks, but had fraudulently diverted only $3,700,000.00 from Bank One.  Erpenbeck argued that "all of the collateral that he put for the $6.9 million in loans he took out . . . must be credited solely toward the $3.7 million that he fraudulently diverted from the bank." 532 F.3d at 433.  The Sixth Circuit stated that Erpenbeck "mistakenly assume[d]" that all of his collateral should offset only the fraudulently diverted funds,  "as opposed to being prorated over the total amount of the loan."  532 F.3d at 433.  The Sixth explained that, because Bank One could foreclose on all of Erpenbeck's collateral "to make up the difference in what Erpenbeck owed to it, so there is no reason why the value of EDC's collateral should be credited only against the amount fraudulently diverted."  532 F.3d at 433.  The Court concludes that the same rationale in support of prorating V. Garcia's collateral holds true for applying his collateral against the gross loss amount.

Third, the Court will accept V. Garcia's estimates of the value of his personal property and assets pledged as collateral to Columbian Bank and First Financial.  The parties do not dispute that both lending institutions may levy on V. Garcia's personal property and collateral.  See Tr. at 166:11-23 (Bowles, Court, Gerson).  V. Garcia has provided an estimated value of all his personal property and assets that he pledged as collateral to the lending institutions.  Although the United States disputes the value of V. Garcia's personal property and assets, the United States has offered no evidence to contradict V. Garcia's asserted estimates, and it bears the burden of proof.  See U.S. Objections at 6; United States v. Snow, 663 F.3d at 1161 (upholding the government's estimate of the fair market value of a defendant's pledged

collateral, over the defendant's objection, where the defendant provided no alternative methodology for calculating the fair market value of the collateral).  Were the Court structuring a restitution payment schedule for V. Garcia, the Court would be permitted, pursuant to 18 U.S.C. § 3664, to consider V. Garcia's statements made under oath "fully describing [his] financial resources . . . including a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested."  18 U.S.C. § 3664(d)(3).  Additionally, the Court would be permitted to adjust V. Garcia's payment schedule in accordance with changes to V. Garcia's economic circumstances over time and in light of "facts on the record."  United States v. Overholt, 307 F.3d 1231, 1255-56 (10th Cir. 2002)(citing 18 U.S.C. § 3664(f)(3)("Of course, the defendant's economic circumstances may change significantly over time. . . .  The court is to be notified of the change in circumstances and then may adjust the schedule accordingly." (citing 18 U.S.C. § 3664(k)).  V. Garcia estimated the value of his personal property and assets under oath at the hearing, which is similar to making a statement in an affidavit regarding his financial resources.  Further, V. Garcia conceded that a number of items of personal property and assets have decreased in value from the time he first reported them to the USPO, which lends additional credence to his estimations.  The Court will, thus, accept V. Garcia's estimates of the value of his personal property and assets, and, where the exact figure is uncertain, the Court will use the most conservative figure possible based on the information available to the Court.  See United States v. Snow, 663 F.3d at 1161 ("[W]e cannot say that district court erred in using the only information available to it in estimating the loss.");  United States v. Masek, 588 F.3d 1283, 1289 (10th Cir. 2009)("In adopting the most conservative figures advanced by the government in determining the amount of loss . . . , the district court acted consistently with its obligation to arrive at a 'reasonable estimate' . . . . (quoting U.S.S.G. § 2B1.1, cmt. n.3(C)).  Additionally, the

Court will accept the most recent appraisals of the fair market value of Lockhaven Estates and Copper Square, pursuant to U.S.S.G. § 2B1.1, cmt. n.3(E)(ii).[26]

The Court determines that V. Garcia is entitled credits as set forth below:

|  | Columbian Bank (FDIC as receiver) | First Financial |
|---|---|---|
| Outstanding loan balance | $15,430,533.08[27] | $5,600,000.00 |
| 12/20/06 Fraudulent draw down | $42,323.00 |  |
| 1/23/07 Fraudulent draw down | $38,419.00 |  |
| 2/13/07 Fraudulent draw down | $365,677.00 |  |

---

[26] Although the United States asserted at the hearing that the Court may need to determine the validity of the appraisals for Lockhaven Estates, that assertion was based upon an incorrect understanding that there were two appraisals in evidence for Lockhaven Estates, which appraised the property at values differing by over $1,000,000.00 in the span of only a few months. See Tr. at 170:10-18 (Gerson)("For the one[s] that were for [L]ock[]haven that were about three and a half months of each other it probably would be reason[able] . . . to look at both and try to determine . . . which of them it thinks is more persuasive."). The USPO also mistakenly indicated that Lockhaven Estates was appraised at $1,600,000.00 on August 4, 2011. See PSR ¶ 60, at 23 ("According to the 'Appraisal of Real Property," report . . . regarding the Copper Square property, as of August 4, 2011, the market value of Lockhaven Estates was determined to be $1,600,000.00."). The United States submitted three appraisals to the Court, two for Copper Square and one for Lockhaven Estates. See Government Exhibit 1 (listing the appraised value of Copper Square as of January 22, 2010 as $5,675,000.00); Government Exhibit 2 (listing the appraised value of Copper Square as of August 4, 2011 as $1,600,000.00);Government Exhibit 3 (listing the appraised value of Government Exhibit 2 (listing the appraised valued of Lockhaven Estates as of November 21, 2011, as $560,000.00). The Court concludes that the most recent appraisals for both properties represent the most reliable evidence available regarding "the fair market value of the collateral at the time of sentencing," especially given the declining real estate market in New Mexico and in Albuquerque, particularly, and will, accordingly, use those estimates for calculating V. Garcia's credits. U.S.S.G. § 2B1.1, cmt. n.3(E)(ii).

[27] The USPO included the $555,000.00 which the FDIC received from the sale of the Downtown Anasazi mortgage note in its calculation of the outstanding balance V. Garcia owes on his loans with Columbian Bank, see Tr. at 133:1-4 (Probation Officer), and, thus, the Court will not include the proceeds from the sale of the Downtown Anasazi mortgage note as a credit for V. Garcia.

| | | |
|---|---|---|
| 7/30/07 Fraudulent draw down | $62,156.52 | |
| 8/15/07 Fraudulent draw down | $144,478.80 | |
| 10/8/07 Fraudulent draw down | $61,183.12 | |
| 5/15/08 Fraudulent draw down | | $128,471.24 |
| **Total fraudulent draw downs (gross loss)** | **$714,237.44** | **$128,471.24** |
| **Fraudulent draw downs/outstanding loan balance** | **4.63%** | **2.29%** |
| Lockhaven Estates | $560,000.00 | |
| Transfer of Participation interest in Copper Square (14.9% of net proceeds from Copper Square)[28] | $202,640.00 | |

---

[28] The parties submitted no evidence to the Court regarding the value that the FDIC received upon the transfer of Columbian Bank's participation interest in Copper Square to a Dallas-based investment group. See Tr. at 40:20-41:1 (Heyward)("[W]hen Columbian bank was taken over by FDIC that asset became property of FDIC. . . . [T]hat participation interest . . . they . . . sold . . . to this investment group out of Dallas who now owns that note or that participation interest."); id. at 51:18-22 (Bowles, Heyward); id. at 51:23-52:8 (Heyward relating that he does not know if the FDIC received any funds from the transfer of Columbian Bank's participation interest to a Dallas-based investment group). The Court determines that V. Garcia should receive a credit for the transfer of the participation interest, because the Court does not believe that it is logical or plausible that the FDIC "sold"/transferred the participation interest without acquiring any value in return. The Court estimates the value that the FDIC likely received from the transfer of the participation interest, given that the interest entitles its holder to fourteen-point-nine percent of the net proceeds of the sale of Copper Square, the participation interest was sold a "year or two" after the FDIC took over Columbian Bank in 2008, that First Financial would likely spend fifteen percent of the sale price of Copper Square in closing costs, and Meacham testified that the FDIC will rarely receive the appraised value of a property in the current commercial real estate market. See Tr. at 40:20-41:1 (Heyward)(explaining that the FDIC sold the participation interest a year or two after taking over Columbian Bank); id. at 4:17-21 (Heyward)(estimating that if Copper Square sold for $2,000,000.00 the net proceeds would be approximately $1,700,000.00, or eighty-five percent of the sale price); id. at 41:2-7 (Gerson, Heyward), id. at 51:1-15 (Bowles, Heyward)(explaining that the holder of the participation interest will receive fourteen-point-nine percent of the net proceeds of the sale of Copper Square); id. at 71:24-72:6 (Meacham)(explaining that the FDIC rarely receives the full appraised value of a property in the current market). In 2010, the appraised value of Copper Square was

| | | |
|---|---|---|
| V. Garcia's Wells Fargo personal checking account | $100.00 | |
| V. Garcia's Wells Fargo commercial checking account | $50.00 | |
| V. Garcia's income from the sale of assets[29] | $16,500.00 | |
| V. Garcia's artwork[30] | $50,000.00 | |
| V. Garcia's coin collection | $20,000.00 | |
| V. Garcia's jewelry | $5,500.00 | |
| V. Garcia's furniture, fixtures, and equipment | $5,000.00 | |
| V. Garcia's knife collection | $8,500.00 | |
| V. Garcia's 1974 Mercedes Benz 450 SL | $25,000.00 | |
| V. Garcia's 1994 | $5,000.00 | |

$5,675,000.00.  See Government Exhibit 1.  Given the economic downturn in the commercial real estate market, the Court assumes that the a right to participate in the future sale of a commercial real estate building would not pay more for the interest than what it could reasonably expect to acquire in a future sale.  The Court will estimate that an investment group, presumably a sophisticated investor, would predict that Copper Square would fall in value, and, thus, the Court concludes that it is reasonable that the Dallas-based investment group did not pay more than the current value of the participation interest in Copper Square when it acquired the interest from the FDIC.  The Court concludes that a conservative estimate of the value the FDIC received upon the transfer of the participation interest is $718,738.75 ($1,600,000.00 x 15% (closing costs) = $240,000.00.  $1,600,000.00 - $240,000.00 = $1,360,000.00 (net proceeds were Copper Square to sell at fair market value around 2010)  $1,360,000.00 x 14.9 % = $202,640.00).

[29] V. Garcia could not recall, at the hearing, the value he received from the sale of cash assets.  See Tr. at 124:24-125:1 (Garcia).  The Court will use the figure listed in the PSR as an estimate of the value V. Garcia received from a Lexus and gold and silver coins, because V. Garcia's estimates on the value of other assets seem accurate, and the United States has presented no evidence to rebut the value of the sale of these assets that V. Garcia originally reported to the USPO.  See PSR ¶ 88, at 33; id. ¶¶ 89-90, at 36.

[30] V. Garcia estimated that his artwork is worth between $50,000.00 and $75,000.00.  See Tr. at 125:3-6.  The Court will use a conservative estimate of V. Garcia's artwork: $50,000.00.

| | | |
|---|---|---|
| Mercedes Benz 600 SL | | |
| V. Garcia's vehicle of unknown make or model[31] | $7,000.00 | |
| V. Garcia's Scottrade brokerage account | $250.00 | |
| V. Garcia's Oppenheimer IRA | $2,200.00 | |
| V. Garcia's interest in Biotech Partners LLC | $31,550.00 | |
| V. Garcia's interest in White Oak Investments | $150,000.00 | |
| V. Garcia's interest in Wisdoms by Vincent | $50,000.00 | |
| **Total value of V. Garcia's personal property and assets** | **$376,650.00[32]** | |
| Copper Square | | $1,397,360.00[33] |
| **Total value of V. Garcia's credits** | **$1,177,290.00** | **$1,397,360.00** |

---

[31] V. Garcia could not substantiate the value of the vehicle he possesses of an unknown make or model. See Tr. at 145:23-126:7 (Bowles, Garcia). The USPO reports that the vehicle is worth between $7,000.00 and $10,000.00, and the Court will adopt a figure at the low end of that range. See PSR ¶ 88, at 33; id. ¶ 92, at 36.

[32] Although V. Garcia pledged his personal property and assets as collateral for his loans with both First Financial and Columbian Bank, it does not appear that his credits with Columbian Bank are sufficient to satisfy the outstanding balance on his loan it. Because V. Garcia took out a loan with Columbian Bank before First Financial, the Court will assume that Columbian Bank has the priority lien on V. Garcia's personal property and assets, and will apply that pledged collateral to offset Columbian Bank's losses alone.

[33] The Court deducts the anticipated participation interest from the fair market value of Copper Square minus fifteen percent in closing costs, as First Financial will not receive fourteen-point-nine percent (the participation interest) of the net proceeds from Copper Square if it sells. ($1,600,000.00 x 15% = $240,000.00 in closing costs. $1,600,000.00 - $240,000.00 = $1,360,000.00 in net proceeds. $1,360,000.00 x 14.9% = $202,640.00 participation interest to Dallas investment group. $1,600,000.00 - $202,640.00 = $1,397,360.00 value of First Financial's ownership of Copper Square).

- 104 -

| Credits                  x fraudulent draw downs/outstanding balance (rounded to nearest dollar) | $54,509.00 | $32,000.00 |
|---|---|---|
| Net loss | $659,728.44 | $96,471.25 |

The Court determines, thus, that the net loss V. Garcia's bank fraud caused is $756,199.69. Accordingly, the net loss that V. Garcia's offense caused warrants a 14-level increase to his base offense level, pursuant to U.S.S.G. § 2B1.1 (b)(1)(H).

## III.   V. GARCIA DID NOT USE SOPHISITCATED MEANS TO COMMIT BANK FRAUD CAUSING PECUNIARY HARM TO LESS THAN TEN VICTIMS.

V. Garcia objects to the USPO's enhancements pursuant to U.S.S.G § 2B1.1(b)(2)(A), for there being ten or more victims of his offense, and pursuant to U.S.S.G. § 2B1.1(b)(10)(C), for his use of sophisticated means in the commission of bank fraud. See V. Garcia Objections at 8-10. The Court determines that there are less than ten victims of V. Garcia's offense and that V. Garcia did not use sophisticated means to commit bank fraud.

According to the U.S.S.G. § 2B1.1, cmt. n.1, a "victim" is any person "who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1, cmt. n.1. The Court has already determined that there is insufficient evidence to conclude that the subcontractors' pecuniary losses were caused by V. Garcia's relevant conduct. The Court, thus, agrees with V. Garcia that, because the subcontractors did not suffer the actual loss incurred in this case, the subcontractors are not victims within the meaning of U.S.S.G § 2B1.1(b)(2)(A). V. Garcia objects to the USPO's determination that the subcontractors are victims in this matter, and the United States has presented no evidence to controvert V. Garcia's assertion. In the absence of a preponderance of the evidence demonstrating that the subcontractors' pecuniary harm was reasonably foreseeable to V. Garcia, and that V. Garcia's bank fraud was the but-for

cause thereof, the Court cannot find, soundly, over V. Garcia's objection, that the subcontractors are victims in this matter.  See United States v. Orr, 567 F.3d at 617 (holding that a district court erred to rely on statements in the PSR regarding the number of victims of a defendant's fraud, where the defendant objected to the PSR's statements and the government did not provide any evidence to supports its assertion that the number of victims was at least seventy).  The Court will, thus, sustain V. Garcia's objection to paragraph 61 of the PSR.  The Court recognizes that the subcontractors feel that they are victims of V. Garcia's and that he caused them great loss.  In the end, however, they did not get paid because the project failed, and not because he made fraudulent draw downs.  The fraudulent draw downs did not help the situation, but they were not the but for and proximate cause of V. Garcia's failure to pay the subcontractors.  The Court does not have evidence before it to contradict V. Garcia's evidence that the general downturn in the commercial real estate market caused him to be unable to pay the subcontractors.  Additionally, had Columbian Bank not failed, V. Garcia may have been able to secure more funds to pay the subcontractors.  The Court, therefore, will not include the number of subcontractors in the total number of victims of V. Garcia's offense.

V. Garcia asserts that "there was nothing Mr. Garcia did to execute or conceal the offense he pled to that was especially complex or intricate."  V. Garcia Objections at 9-10.  According to the application notes to U.S.S.G. § 2B1.1, sophisticated means refers to "especially complex or intricate offense conduct pertaining to the execution or concealment of an offense."  U.S.S.G. § 2B1.1, cmt. n.8(B).  V. Garcia admits that he directed Barnhill to withdraw funds from Columbian Bank to purchase the J&J Casino, fully aware that Barnhill would be required to represent to Columbian Bank that the funds were used for a legitimate purpose.  See Plea Agreement ¶ 8(c), at 4.  As the Court has previously explained, the "use" of sophisticated means

does not require that the defendant actually create the sophisticated means employed.  United States v. Tilga, 824 F. Supp. 2d at 1332-33 ("There is nothing in the comments or the case law to suggest that a person must create the sophisticated means to qualify for the enhancement.").  On the other hand, there is no evidence before the Court that V. Garcia or Barnhill did anything especially complex or intricate to conceal the fraudulent draw down.  Although Barnhill created false invoices, he does not seem to have done so in a particularly complex fashion that made detection of the offense difficult for First Financial or Columbian:  he simply used company invoices obtained from Blue Dot's files or the internet, and printed false invoices with the company's logos.  See PSR ¶ 33, at 13-14; United States v. Guidry, 199 F.3d at 1158 (finding that a defendant committed embezzlement through sophisticated means because the method by which she deposited and used the embezzled funds made detection of the offense particularly difficult).  Neither V. Garcia nor Barnhill used "fictitious entities, corporate shells, or offshore financial accounts" to commit bank fraud, rather, the functional equivalent of lying about work that was done.  U.S.S.G § 2B1.1, cmt. n.8(B).  See United States v. Rice, 52 F.3d at 845,49 (finding that a defendant did not use sophisticated means to commit tax fraud where he claimed withholding that was not withheld, as the defendant's tax fraud was the "functional equivalent of claiming more in itemized deductions than actually paid").  Nor did V. Garcia and Barnhill create multiple fraudulent invoices and defraud many institutions: they fraudulently drew down funds on seven occasions from two lending institutions.  Cf. United States v. Snow, 663 F.3d at 1163 (finding that the a defendant's forty fraudulent transactions and deceit of at least twelve financial institutions demonstrated that the defendant used sophisticated means to commit fraud).  The Court determines, therefore, that V. Garcia should not receive a 2-level enhancement his offense level, pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

In conclusion, the Court adopts portions of the United States and V. Garcia's methodology for the calculation of the net loss V. Garcia's offense incurred. The Court accepts the parties' methodology for determining the gross loss amount, but the Court does not accept the stipulated gross loss amount in the Plea Agreement. The Court determines that the gross losses V. Garcia's offense caused is the sum total of the fraudulent draw downs: $842,708.65. The Court will apply V. Garcia's credits on a victim by victim basis, and reduce the credits by the ratio of V. Garcia's fraudulent draw downs to the outstanding balances on his loan. The Court determines, thus, that the net losses V. Garcia's offense caused is $756,199.69, and a 14-level enhancement to V. Garcia's base offense level, pursuant to U.S.S.G. § 2B1.1(b)(1)(H) is warranted. The Court finds that there were less than ten victims in this case, as the United States has presented evidence that the lending institutions alone suffered a pecuniary harm reasonably foreseeable to result from V. Garcia's bank fraud. V. Garcia, thus, will not receive a sentencing enhancement pursuant to U.S.S.G. § 2B1.1(b)(2) for the number of victims of his offense. Lastly, the Court finds that V. Garcia did not use sophisticated means to commit bank fraud, as his offense was not particularly difficult to detect and he did not use offshore accounts or other shell companies to hide his fraud, and, thus, the Court will sustain V. Garcia's objection to the USPO's increase in his base offense level pursuant to U.S.S.G. § 2B1.1(b)(10)(C). V. Garcia's base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1)(B) for the commission of bank fraud, under 18 U.S.C. § 1344, which carries a statutory maximum term of 30 years. See U.S.S.G. § 2B1.1(a)(1)(B)("Base Offense Level: 7, if . . . (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more . . . ."). V. Garcia receives a 14-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(H). See U.S.S.G § 2B1.1(b)(1)(H)("Specific Offense Characteristics: If the loss exceeded $5,000, increase the offense level . . . More than

$400,000 add **14**").   V. Garcia receives a 3-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, V. Garcia's total offense level is 18.   V. Garcia's criminal history category is I, and, thus, with a total offense level of 18, V. Garcia's guideline imprisonment range is 27 to 33 months.

**IT IS ORDERED** that the United States' Objections to Presentence Report, filed May 4, 2012 (Doc. 89) are sustained in part and overruled in part; and (ii) the Defendant Vincent Garcia's Formal Objections to the Presentence Report, filed August 6, 2012 (Doc. 101) are sustained in part and overruled in part.   The Court adopts the parties' proposed method for calculating the gross loss amount, but the Court will not adopt the gross loss amount to which the parties stipulate in the Plea Agreement, filed August 19, 2011.   The Court adopts the United States' proposed method for applying V. Garcia's credits to offset the net losses on a pro rata basis.   The Court will use V. Garcia's estimate of the value of his personal property and assets in the Court's estimation of the value of V. Garcia's credits.   The Court sustains V. Garcia's objection to a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C), for the use of sophisticated means in the commission of bank fraud, and sustains Garcia's objection to a 2-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(2), as the Court concludes V. Garcia's offense involved less than ten victims.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

B.J. Crow
Crow Law Firm
Albuquerque, New Mexico

        -- and --

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

    *Attorneys for the Defendant*

Kenneth J. Gonzales
  United States Attorney
Jonathan M. Gerson
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*